2011 UT 31

**Ron THAYER and Cathie Thayer, Plaintiffs and Appellants,**

v.

**WASHINGTON COUNTY SCHOOL DISTRICT; City of Saint George; Robert Goulding; Michael Eaton; Stacy Richan; David Amodt; John and Jane Does 1–10; ABC Corporations 1–10; and XYZ Partnerships 1–10, Defendants and Appellees.**

No. 20100648.

Supreme Court of Utah.

May 25, 2012.

Jeffrey C. Wilcox, Michael I. Welker, Jason N. Dixon, Salt Lake City, for appellants.

Bridget K. Romano, Peter Stirba, Stephanie L. Warner, Julia D. Kyte, Bret W. Rawson, Salt Lake City, for appellees.

Justice DURHAM, opinion of the Court:

## INTRODUCTION

¶ 1 This case arises from a lawsuit in federal district court over the death of fifteen-year-old Tucker Thayer. In that suit, Tucker's parents allege that Washington County School District officials were negligent when they allowed a gun loaded with blank cartridges to be used in a school musical production, resulting in their son's death. The school district asserts governmental immunity from these claims.

¶ 2 Because the school district's argument raises a novel issue of state law, the U.S. District Court for the District of Utah certified the governmental immunity question to us. We agreed to decide whether the conduct of school officials and those acting on the school district's behalf constituted the "issuance ... [of a] permit, license, certificate, approval, order, or similar authorization" such that the school district has retained immunity. UTAH CODE § 63G–7–301(5)(c). We hold that the conduct of school district officials in allowing the gun to be present on school grounds does not fall within this provision.

## BACKGROUND [1]

¶ 3 In the fall of 2008, the drama department of Desert Hills High School (DHHS) staged a production of the musical *Oklahoma!* Tucker was a stage technician in the production. To enhance the production's sound effects during gunshot scenes, theater instructor and school district employee Michael Eaton wanted to fire blank bullets from a real gun, rather than use a prop gun. David Amodt, the father of a student involved in the production, offered his Smith & Wesson .38–caliber, six-shot revolver for use in the musical.

¶ 4 Mr. Eaton consulted School Resource Officer Stacy Richan about the use of the gun in the production because school policy and state law prohibited the possession of a firearm on school grounds. Officer Richan, the school's in-house representative from the St. George Police Department, approved the use of the gun on school property, subject to three conditions: (1) only an adult could transport the weapon to and from school for rehearsals and performances, (2) the weapon would remain in a locked container and be under an adult's control when not in use, and (3) only an adult could handle and fire the weapon. Officer Richan then approached DHHS Vice Principal Robert Goulding about the presence of the gun on school property. He informed Goulding that he had authorized use of the gun in the production. Goulding agreed with Officer Richan's decision and authorized use of the gun during the production, subject to the conditions Officer Richan had imposed.

¶ 5 Despite Officer Richan's conditions, Tucker was allowed to handle and fire the weapon. On November 15, 2008, Tucker was in the production's sound booth without adult supervision. The gun was discharged near his head, and although the firearm was loaded with a blank cartridge, the muzzle blast drove skull fragments into Tucker's brain. He died later that night.

¶ 6 After their son's death, Ron and Cathie Thayer filed state law negligence and wrongful death claims and federal civil rights claims against various defendants in the U.S. District Court for the District of Utah. The only claims at issue in this certified question are the Thayers' negligence claims against the school district stemming from the conduct of Vice Principal Goulding and Mr. Eaton. With respect to these claims, the school district moved for judgment on the pleadings under rule 12(c) of the Federal Rules of Civil Procedure, asserting immunity under the Governmental Immunity Act of Utah. It argued that it retained immunity from suit because Tucker's injuries arose out of, or

---

1. The facts surrounding Tucker's death are taken from the Thayers' complaint. The parties have stipulated to these facts for purposes of certification of the state law question before this court.

resulted from, the "issuance ... [of a] permit, license, certificate, approval, order, or similar authorization" (the Licensing Exception). UTAH CODE § 63G–7–301(5)(c). The federal district court certified the governmental immunity question to this court, and we have jurisdiction under section 78A–3–102(1) of the Utah Code.

## STANDARD OF REVIEW

¶ 7 "On certification, we answer the legal questions presented without resolving the underlying dispute." *Iverson v. State Farm Mut. Ins. Co.*, 2011 UT 34, ¶ 8, 256 P.3d 222 (internal quotation marks omitted).

## ANALYSIS

¶ 8 When a governmental entity asserts immunity under the Governmental Immunity Act of Utah, this court typically applies a three-part test to determine whether immunity applies. *Peck v. State*, 2008 UT 39, ¶ 8, 191 P.3d 4. "The test assesses (1) whether the activity undertaken is a governmental function; (2) whether governmental immunity was waived for the particular activity; and (3) whether there is an exception to that waiver." *Id.* (internal quotation marks omitted).

¶ 9 In this case, the first two questions are not at issue. It is undisputed that the school district was engaged in a governmental function under the Act's general grant of immunity. *See* UTAH CODE § 63G–7–201(1). It is also undisputed that, under the allegations in the Thayers' complaint, the school district waived its immunity because Tucker's death was "proximately caused by a negligent act or omission of [a governmental] employee committed within the scope of employment." *Id.* § 63G–7–301(4). The sole question certified for our review is whether the school district has retained immunity under the Licensing Exception—section 63G–7–301(5)(c) of the Utah Code. Under this exception, the school district retains immunity if Tucker's injury "ar[ose] out of, in connection with, or result[ed] from ... the issuance, denial, suspension, or revocation of ... any permit, license, certificate, approval, order,

or similar authorization." *Id.* § 63G–7–301(5)(c).

¶ 10 The school district concedes that its officials did not issue a permit, license, certificate, or order allowing the presence of the gun on school grounds. Instead, it argues that the Licensing Exception applies because Tucker's death arose out of Officer Richan's and Vice Principal Goulding's issuance of an "approval" or "authorization" granting permission for the revolver to be at DHHS. In contrast, the Thayers contend that the Licensing Exception "is intended to cover the regulatory, discretionary activities of government agencies that are endowed with the authority to regulate a particular activity" and does not apply to school officials' negligent operational decision to create a dangerous condition at the school.

¶ 11 From the plain language of the statute, we conclude that the Licensing Exception applies only to formal, official, regulatory authorizations by a governmental entity empowered to issue, deny, suspend, or revoke such authorizations. We also conclude that Officer Richan's and Vice Principal Goulding's authorization of the presence of the firearm on school grounds was not such a formal, official, and regulatory authorization. In addition, we hold that the Licensing Exception is unavailable in this case because it does not apply to a governmental entity's internal approval or authorization of an employee's negligent conduct. A contrary interpretation of the exception would permit it to "swallow the rule" and would compromise the harmonious whole of the Governmental Immunity Act.

¶ 12 To determine the meaning of "approval" and "authorization" as used in the Licensing Exception, we begin our analysis with the statute's plain language, from which we seek to ascertain the intent and purpose of the legislature. "Under our rules of statutory construction, we must give effect to every provision of a statute and avoid an interpretation that will render portions of a statute inoperative." *Warne v. Warne*, 2012 UT 13, ¶ 36, 275 P.3d 238. In analyzing the Governmental Immunity Act, we have "decline[d] to stray from the plain meaning of the text where the statute is unambiguous

and there is no compelling reason to believe that the legislature has misspoken." *Moss v. Pete Suazo Utah Athletic Comm'n*, 2007 UT 99, ¶ 13, 175 P.3d 1042.

¶ 13 Under the Licensing Exception, a governmental entity retains immunity if an injury caused by an employee's negligence "ar[ose] out of, in connection with, or result[ed] from ... the issuance, denial, suspension, or revocation of ... any permit, license, certificate, approval, order, or similar authorization." UTAH CODE § 63G–7–301(5)(c). The causation language of the exception ("ar[ose] out of, in connection with, or result[ed] from") is not at issue in the certified question before us. The operative text at issue can be separated into two categories of terms: those relating to the governmental action ("issuance, denial, suspension, or revocation") and those relating to the object of that action ("permit, license, certificate, approval, order, or similar authorization").

¶ 14 With respect to the first category, each word describes a formal action undertaken as part of an entity's official power. For example, "issuance" derives from the verb "issue," which means "[t]o send out or distribute officially," BLACK'S LAW DICTIONARY 908 (9th ed. 2009), and "to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1201 (1961). Similarly, a "revocation" is "[a]n annulment, cancellation, or reversal, usu[ally] of an act or power." BLACK'S LAW DICTIONARY 1435. "Denial" and "suspension" also are imbued with connotations of formality and official power. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 602 (defining "denial" as a "refusal to grant, assent to, or sanction"); *id.* at 2303 (defining "suspension" as a "tempo-

rary remission of action or execution (as of a law, regulation, or rule)").[2]

¶ 15 Moreover, the formal, official nature of the governmental action in question informs our interpretation of the second category of terms, which describe *what* is being issued, denied, suspended, or revoked. Among these terms are "approval" and "authorization." In determining the meaning of these words, we note their placement in a list of terms that includes "permit," "license," "certificate," and "order." A "commonsense [approach] ... counsels that a word is given more precise content by the neighboring words with which it is associated." *United States v. Williams*, 553 U.S. 285, 294, 128 S.Ct. 1830, 170 L.Ed.2d 650 (2008); *see also Salt Lake City v. Salt Lake Cnty.*, 568 P.2d 738, 741 (Utah 1977). While not always helpful, this interpretive canon, known as *noscitur a sociis*, is useful here because the terms surrounding "approval" and "authorization" have a common feature from which we may extrapolate meaning. *Cf. S.D. Warren Co. v. Me. Bd. of Envtl. Prot.*, 547 U.S. 370, 379–80, 126 S.Ct. 1843, 164 L.Ed.2d 625 (2006) ("*[N]oscitur a sociis* is no help absent ... a common feature to extrapolate."); *Beecham v. United States*, 511 U.S. 368, 371, 114 S.Ct. 1669, 128 L.Ed.2d 383 (1994) ("That several items in a list share an attribute counsels in favor of interpreting the other items as possessing that attribute as well."). This common attribute, illustrated in the following definitions, is formal and official action:

- Permit: "A certificate evidencing permission; a license," BLACK'S LAW DICTIONARY 1255; "a written warrant or license granted by one having authority," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1683.

2. It is true that the terms "issuance, denial, suspension, [and] revocation" may not in all contexts impart formality and official action. But these terms must be viewed in the context of the Governmental Immunity Act, which seeks to immunize governmental entities and their employees who perform governmental functions. Thus, although these terms may in some circumstances have informal and unofficial connotations, we are interpreting them in the context of a statute protecting governmental entities and dealing

with their power to regulate through licensure. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465 ("[W]e do not interpret the 'plain meaning' of a statutory term in isolation. Our task, instead, is to determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)."). We note that in ordinary usage in the context of governmental entities, issuances, denials, suspensions, and revocations are not made in informal or unofficial ways.

- License: "A permission, usu[ally] revocable, to commit some act that would otherwise be unlawful," BLACK'S LAW DICTIONARY 1002; "permission to act" or "a right or permission granted in accordance with law by a competent authority," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1304.

- Certificate: "A document certifying the bearer's status or authorization to act in a specified way," BLACK'S LAW DICTIONARY 255; "a document containing a certified and usu[ally] official statement," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 367.

- Order: "A command, direction, or instruction," BLACK'S LAW DICTIONARY 1206; "an authoritative mandate usu[ally] from a superior to a subordinate" or "a command or direction of a court," WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1588.

¶ 16 Because the terms concerning the government action—"issuance, denial, suspension, [and] revocation"—and those concerning the object of the government action—"permit, license, certificate ..., [and] order"—describe formal, official action, we conclude that the term "approval" shares the same attribute. Indeed, one definition of "approve" is "[t]o give formal sanction to; to confirm *authoritatively*." BLACK'S LAW DICTIONARY 118 (emphasis added). The remaining text of the statute confirms this conclusion. After listing "permit, license, certificate, approval, [and] order," the Licensing Exception states "or *similar authorization*." UTAH CODE § 63G–7–301(5)(c) (emphasis added).

¶ 17 That the statute considers each term a form of authorization is significant. "Authorization" derives from the verb "authorize," which means "[t]o give legal authority; to empower." BLACK'S LAW DICTIONARY 153. A governmental entity or employee therefore cannot issue an authorization— or "permit, license, certificate, approval, [or] order"—unless it has the power "[t]o give legal authority." Moreover, a governmental entity must *have* legal authority in order to *give* legal authority. The only way in which a governmental entity has such authority is through legislative or executive enactment.

¶ 18 We hold that the Licensing Exception uses terms reflecting formality, official action, and authorization. A governmental entity may not invoke the Licensing Exception unless it has the authority, as a regulatory body, to formally and officially issue, deny, suspend, or revoke the authorizations listed in the exception, or similar authorizations. This authority may be granted by legislative or regulatory enactment, but the enactment must expressly empower the governmental entity with the ability to "give legal authority" to those seeking such authorizations.

¶ 19 This interpretation of the Licensing Exception also is consistent with our case law. In every instance in which we have held that a governmental entity retained immunity under the Licensing Exception, the entity was empowered with the regulatory authority to issue the authorization in question. For example, *Moss v. Pete Suazo Utah Athletic Commission* involved an athletic commission's approval of a boxer's participation in a match, in which the contestant died. In that case, we detailed the regulations governing the athletic commission's decision to allow a boxer to compete. 2007 UT 99, ¶¶ 3–6, 175 P.3d 1042. We concluded that the commission retained immunity under the Licensing Exception because, even though the commission failed to follow regulations, the boxer's participation in the match concerned the commission's licensing authority. *Id.* ¶ 15. We noted that "the Athletic Commission's *authority* to prevent a boxer from competing is indistinguishable from a licensing decision" and that "[t]he essential element of such a decision continues to be whether to retract governmental authorization of private activity." *Id.* ¶ 19 (emphasis added).

¶ 20 Similarly, in *Gillman v. Department of Financial Institutions*, 782 P.2d 506 (Utah 1989), the plaintiff brought a negligence action against the state's Department of Financial Institutions for failure to properly regulate financial bodies. We held that the department retained immunity under the Licensing Exception because the alleged in-

jury arose from the licensing decisions of the department, which had the statutory authority to regulate and issue licenses to financial institutions. *Id.* at 511; *see also Metro. Fin. Co. v. State*, 714 P.2d 293, 294 (Utah 1986) (applying the Licensing Exception to the Motor Vehicle Division's issuance of automobile title certificates); *DeBry v. Salt Lake Cnty.*, 835 P.2d 981, 986 (Utah Ct App 1992) (applying the Licensing Exception to allegations of the county's "failure to conduct inspections, failure to issue permits, and issuance of a temporary certificate of occupancy").

¶ 21 In this case, the school district has failed to identify any enactments outlining school district officials' ability to regulate the presence of guns on campus or to issue formal, official authorizations in that arena. We are aware of only one statutory provision with arguable relevance. Section 76–10–505.5 of the Utah Code criminalizes the possession of a firearm on school premises as a class A misdemeanor. This penalty does not apply, however, if "the possession is approved by the responsible school administrator." UTAH CODE § 76–10–505.5(4)(b). At oral argument, the school district contended that Mr. Goulding was the "responsible school administrator" and that this provision may be read as authorizing him to regulate the presence of firearms on school grounds.

¶ 22 Section 76–10–505.5, however, is a criminal statute imposing penalties on those who possess firearms on school grounds and providing a defense to criminal liability if the "responsible school administrator" approved the possession of the firearm. That a defendant may be excused from criminal liability based on such approval, however, does not mean that the "responsible school administrator" is endowed with regulatory authority over the presence of firearms on campus. Accordingly, we do not read this provision to have expressly allowed school officials to issue a formal, official approval or authorization within the meaning of the Licensing Exception.

¶ 23 There is another reason to reject the school district's interpretation of the Licensing Exception. A governmental entity may not issue approvals or authorizations to itself or its employees to immunize

negligent conduct under the Governmental Immunity Act. We must read all parts of the Act in harmony with one another and take care to avoid a construction that renders any part "inoperative or superfluous." *State v. Jeffries*, 2009 UT 57, ¶ 9, 217 P.3d 265 (internal quotation marks omitted). With this in mind, we note that the Act operates to grant immunity to governmental entities for their governmental functions. UTAH CODE § 63G–7–201(1). But it waives that immunity for injuries "proximately caused by a negligent act or omission of an employee committed within the scope of employment." *Id.* § 63G–7–301(4).

¶ 24 Were we to accept the school district's interpretation of the Licensing Exception, the waiver of immunity for acts of employee negligence would become a nullity. Governmental employees' actions are frequently, if not always, approved or authorized by their employers in some fashion. Were we to interpret the Licensing Exception to include such routine operational approvals, the waiver of immunity in employee negligence cases would be rendered useless because governmental entities would all have the ability to circumvent the provision. The Licensing Exception would "swallow" the waiver rule. *See Johnson v. Utah Dep't of Transp.*, 2006 UT 15, ¶ 19, 133 P.3d 402.

¶ 25 This conclusion is reinforced by looking to other waivers of immunity subject to the Licensing Exception. For instance, immunity is waived for injuries caused by "a defective, unsafe, or dangerous condition of any highway, road, street, alley, crosswalk, sidewalk, culvert, tunnel, bridge, viaduct, or other structure located on them" or by "any defective or dangerous condition of a public building, structure, dam, reservoir, or other public improvement." UTAH CODE § 63G–7–301(3)(a). The governmental entities in charge of such public improvements—for example, the Utah Department of Transportation (UDOT)—almost always approve or authorize aspects of their own work. It would be illogical for the legislature to have enacted a waiver of immunity in instances where UDOT's construction of a defective highway leads to an injury, but also to have permitted retention of immunity under the Licensing

Exception where UDOT authorizes and approves its own defective construction.

¶ 26 Nor has the school district offered any support for the notion that the Licensing Exception applies when a governmental entity has approved or authorized the negligent conduct of its own employees. As noted above, all the cases from this state applying the exception have done so when the governmental entity was endowed with regulatory authority to issue, deny, suspend, or revoke authorizations concerning private conduct. Although many states have immunity statutes with similar licensing exceptions, the school district has not cited any case that supports its broad interpretation of the terms "approval" and "authorization."

¶ 27 For the foregoing reasons, we hold that the conduct of school district officials and those acting on the district's behalf does not qualify for a retention of immunity under section 63G–7–301(5)(c) of the Utah Code.

## CONCLUSION

¶ 28 In response to this certified question from the federal district court, we hold that the Licensing Exception does not apply to the conduct of school district officials and those acting on the district's behalf. Officer Richan's and Vice Principal Goulding's authorization of the presence of the firearm on campus was not a formal, official authorization by a governmental body or employee endowed with regulatory power to issue such an authorization. In addition, a governmental entity such as the school district may not insulate itself from suit by routinely authorizing and approving the negligent conduct of its employees. A contrary interpretation of the Licensing Exception would not be in harmony with the whole of the Governmental Immunity Act.

Justice DURHAM authored the opinion of the Court, in which Associate Chief Justice NEHRING, and Justice PARRISH joined.

Justice LEE filed a dissenting opinion in which Chief Justice DURRANT joined.

Justice LEE, dissenting in part:

¶ 29 The question certified to us by the federal district court in this case is whether the Washington County School District is entitled to immunity under the "licensing exception" to the waiver of governmental immunity in Utah Code section 63G–7–301(5)(c). I disagree with the court's conclusion that the School District lacks immunity as a matter of law. In my view, the District's immunity depends on the resolution of questions of fact that are not before us. I would highlight those questions and leave their resolution to further proceedings in the federal district court.

¶ 30 The question whether an authorization triggers the licensing exception, UTAH CODE § 63G–7–301(5)(c), seems to me to depend not on the formality of the approval but on its function. And under a functional analysis, the authorizations encompassed in the licensing exception are defined by their effect, which is to give permission to a third party to engage in conduct that is otherwise prohibited by law. Because the School District issued just such an authorization when it approved the possession of a handgun owned by a third party (Amodt) on school premises, I would hold that it implicated the licensing exception for reasons explained below.

¶ 31 Despite my disagreement with the majority on the construction and breadth of the licensing exception, however, I would not find the School District categorically immune from liability for its alleged subsequent negligence in this case. Rather, the District's immunity ought to turn on whether and to what extent Tucker Thayer's death was caused by its subsequent alleged negligence (for which the government is not immune) or by its issuance of an authorization (for which it is immune). Because that question depends on factual issues that are not before us, I would simply identify the legal standards that govern the resolution of these issues and leave their disposition for the ensuing proceedings in federal district court.

I

¶ 32 A government authorization falls within the licensing exception if it amounts to a

"permit, license, certificate, approval, order, or similar authorization." UTAH CODE § 63G–7–301(5)(c). The majority interprets this provision to require "formal and official action" by the government. *Supra* ¶ 15. It derives this requirement through the *noscitur a sociis* canon of construction, which assists statutory interpretation by suggesting that "the meaning of doubtful words or phrases be determined in the light of and take their character from associated words and phrases." *Heathman v. Giles*, 13 Utah 2d 368, 374 P.2d 839, 840 (1962).

¶ 33 I agree with the court that there is ambiguity in the terms of the licensing exception that requires interpretation. The terms "approval" and "similar authorization" are of doubtful scope in this context. They could conceivably be construed broadly to encompass any and all governmental expressions of consent, or narrowly to be limited to the kinds of authorization set forth in the statute. The court is right to decline to extend the licensing exception to internal, operational approvals. I disagree, however, with the court's use of the *noscitur a sociis* canon of construction to limit the statute to those authorizations issued by the government with a sufficient (but undefined) degree of formality.

¶ 34 I would interpret the licensing exception to encompass any authorization that has the effect of granting permission for private conduct that would otherwise be unlawful or of requiring an act a party would otherwise be free to refuse to do. Under this definition, moreover, I would find that the School District gave at least one authorization that would qualify it for immunity.

### A

¶ 35 A first step in resolving the ambiguity in the licensing exception is to narrow its scope in a way that preserves independent meaning for the statute's waiver of immunity for acts of negligence. *See* UTAH CODE § 63G–7–301(4). With this provision in mind, I agree with the majority's limiting construction of the statute in one respect: The "approvals" and "authorizations" that

trigger immunity cannot extend to internal, operational consent given by a government employer for the acts of its own employees. If such approvals or authorizations were enough to trigger licensing immunity, routine acts of negligence (for which the government is ordinarily not immune) could be rendered immune by the issuance of an approval of the employee's acts. Since employers routinely approve their employee's conduct, this would throw a blanket of immunity on a wide range of conduct for which the legislature has waived immunity. And it would do so on the perverse ground that the government has compounded its negligence by issuing an affirmative approval of that negligence through the chain of command. That absurd result cannot be what the legislature meant in immunizing "approvals" or "authorizations" in the licensing exception, and I agree with the majority's conclusion that the exception is not triggered "when a governmental entity has approved or authorized the negligent conduct of its own employees." *Supra* ¶ 26.

¶ 36 With that clarification, I see little remaining ambiguity in the scope of the licensing exception, and no room for the majority's conclusion that the only authorizations covered by the statute are those issues with a sufficient degree of formality. The licensing exception's list is a broad, encompassing enumeration of a range of government expressions of authorization of private conduct. The list includes some specific forms of authorization—"permit," "license," and "certificate"—that seem to refer to established legal terms of art. But the list also encompasses broader expressions of permission such as an "approval," an "order," or a "similar authorization." The court's invocation of the *noscitur a sociis* canon is problematic in this context. If "approval," "order," and "authorization" are broader than the terms of art that accompany them in the statute, it would deprive the general terms of their plain meaning to restrict them to the scope of their more narrow neighbors.

¶ 37 Canons of construction are not universal rules of grammar or syntax.[1] They are

---

1. *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 19, 248 P.3d 465 ("[C]anons of construction … are

not formulaic, dispositive indicators of statutory meaning. They are merely tools that guide our

rules of thumb that provide potentially useful cues for resolving ambiguity in written text. Many such rules have exceptions, and a recognized exception to the *noscitur* principle acknowledges that a term of broad application should *not* be narrowed by its neighboring text when its broad meaning is clear.[2] I read the licensing exception's list to clearly encompass a range of government approvals or authorizations without respect to the degree of formality with which they are issued. I therefore find the *noscitur* canon inapplicable given the clear, broad language of the statute.

¶ 38 The majority's formality requirement fails, moreover, even if we read the statute's reference to "approval" and "authorization" in the *noscitur a sociis* light of the provision's surrounding terms. Some of the authorizations listed in the licensing exception often include an element of formality. But that is certainly not always the case, as most of the listed authorizations may be issued informally without the issuance of any signed or sealed document.

¶ 39 That is certainly true of a government "approval."[3] "Permits" may likewise lack the trappings of formality yet still retain their functional efficacy.[4] And even an "order," which often will be reduced to formal writing, may be effective when informally issued. As the majority indicates, "order" is

defined as "a command, direction, or instruction," *supra* ¶ 15, and there is no doubt that even informal, oral orders carry the force of law.[5]

¶ 40 Of all of the authorizations listed in the licensing exception, "certificate" most clearly implies a level of formality, as it is defined as "a document in which a fact is formally attested." BLACK'S LAW DICTIONARY 255 (9th ed. 2009). But this court has recognized the efficacy of certificates that do not bear the traditional markings of formality. In *Harper v. Summit County*, for example, the question of the validity of a zoning decision turned on whether the county had issued a certificate of zoning compliance. 2001 UT 10, 26 P.3d 193. We held that a letter from the planning commission indicating that the facility was a permitted use was an effective "certificate." *Id.* ¶ 15. Because the purpose of a certificate was "to give the County the opportunity to ensure that a proposed project complies with zoning designations," the letter, although not issued on bond paper with an official seal or other formal marking, certified that "the County had reviewed the project and had determined that it complied." *Id.*

¶ 41 For me, this confirms that the essence of the government authorizations listed in the licensing exception is in their function and not their form. The listed authorizations

construction of statutes in accordance with common, ordinary usage and understanding of language.... Such tools must be understood as one of several contextual indicators of statutory meaning.").

2. *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519, 58 Ct.Cl. 708, 43 S.Ct. 428, 67 L.Ed. 778 (1923) ("[*Noscitur a sociis*] is ... not an invariable rule, for [a] word may have a character of its own not to be submerged by its association.").

3. *See, e.g., Harper v. Summit Cnty.*, 2001 UT 10 ¶ 2, 26 P.3d 193 (noting that county gave a railroad company "verbal approval" of a relocation at a planning commission meeting, and shortly thereafter "confirmed its approval" in a letter to the applicant); *Stevens v. LaVerkin City*, 2008 UT App 129, ¶ 3, 183 P.3d 1059 (indicating that individual "obtained informal verbal approval from city officials" to store vehicles on the property, which was later formalized in a conditional use permit from the city council).

4. *See, e.g., UMCO Energy, Inc. v. Dep't of Envtl. Prot.*, 938 A.2d 530, 533 (Pa.Commw.Ct.2007) (company that already had a mining permit requested an "informal permit revision" from a state entity, resulting in an effective modification of the permit conditions).

5. Although judges are immune from suit notwithstanding the governmental immunity statute at issue, the way judges routinely issue "orders" is instructive to our interpretation of this term. An order from a court becomes effective not when it is formalized, but when the parties are bound to follow the direction. *See Hall v. NACM Intermountain, Inc.*, 1999 UT 97, ¶ 25, 988 P.2d 942 (interpreting a judge's "specific direction" given over the telephone to counsel as an effective "order," even though it was issued verbally); *McGavin v. McGavin*, 27 Utah 2d 200, 494 P.2d 283, 283 (1972) (district court properly ordered a paternity test by "a handwritten order informally appearing on a work sheet"). For me, that confirms the conclusion that the essence of an order is its functional effect, not its formal nature.

vary in terms of the typical level of formality. While a certificate may require documentation, approvals and orders are routinely made verbally. This variation in form from one authorization to the next suggests that "formal and official action" is not the defining feature of the listed terms.[6] Instead, the common feature lies in their shared function—of authorizing individuals to engage in behavior that would otherwise be unlawful, or in the case of orders, binding parties to do something they would otherwise be free not to do.[7]

¶ 42 This conclusion is consistent with the accepted definitions of the listed terms. When a person receives a "license," for example, she has been given "permission . . . to commit some act that would otherwise be unlawful." BLACK'S LAW DICTIONARY 1002 (9th ed. 2009). The majority's definition of "authorize" likewise bolsters this conclusion, indicating that the term means "[t]o give legal authority, to empower." *Id.* at 153. The definitions of "permit" and "certificate" suggest a written form, but primarily as evidence to show that the bearer has been legally empowered through an authorization.[8] An order, which is "a command, direction, or instruction," *id.* at 1206, is the inverse of the other authorizations, as it binds one to do something that he would otherwise be free to not do. The definitions of all of these authorizations show that the common thread between them is their power to expand or contract the legal rights of individuals.

¶ 43 The functional approach is also consistent with our precedent. In *Moss v. Pete Suazo Utah Athletic Commission,* we upheld the State Athletic Commission's immunity under the licensing exception in the face of allegations of negligence in failing to follow regulatory conditions and standards for when a boxer should be permitted to compete. 2007 UT 99, ¶¶ 14–19, 175 P.3d 1042. Our analysis focused not on the form of the Commission's decisions but on their function. We noted that "[e]ven though some of the Athletic Commission Rules do not label the Athletic Commission's authority to prevent boxers from competing as the revocation or suspension of a boxing license, the Athletic Commission's authority to prevent a boxer from competing is indistinguishable from a licensing decision." *Id.* ¶ 19. We also defined the functional element of an authorization under the licensing exception in a manner consistent with the approach outlined above, indicating that "[t]he essential element of such a decision [is] whether to retract governmental authorization of private activity." *Id.*

¶ 44 Thus, precedent confirms that it is not the form or the "label" of the government decision that is important but its function. And the relevant function is in authorizing private activity that would otherwise be unlawful.

B

¶ 45 Under this standard, I disagree with the court's conclusion that there was no "au-

---

6. Indeed, the majority never attempts to define the requisite level of formality. Its decision, accordingly, sets the court on a path of ongoing refinement as to the appropriate scope of the licensing exception and the necessary degree of formality. For me, that is another reason to reject the majority's approach, as I doubt the legislature intended the courts to engage in unguided policymaking on a path that is in no way guided by the statutory text. "When presented with alternative interpretations of a statutory scheme, we should choose the one that involves the judiciary least in the enterprise of legislative policymaking." *State v. Parduhn,* 2011 UT 57, ¶ 72, 266 P.3d 765 (Lee, J., dissenting).

7. The majority attempts to buttress its approach by reference to the statute's notion of "issuance, denial, suspension, or revocation" of a government authorization, suggesting that these words somehow convey an element of formality. *Supra* ¶ 16. But even the definitions of these terms

cited by the majority make no reference to any level of formality. They do, as the majority indicates, sometimes connote "official" action, a point confirmed by the fact that these words appear in the context of a "statute protecting governmental entities and dealing with their power to regulate." *Supra* ¶ 14 n. 3. No one doubts that a government authorization would have to be made by a person with official authority, however. The question is whether the authorization could be made informally or would require some element of formality (such as in a written, signed, or sealed document). Nothing in the notion of "issuance, denial, suspension, or revocation" says anything about that issue.

8. A permit is defined as "a certificate evidencing permission; a license," BLACK'S LAW DICTIONARY 1255 (9th ed. 2009), and a certificate is "a document certifying the bearer's status or authorization to act in a specified way," *id.* at 255.

thorization" by the School District sufficient to trigger the licensing exception. The authorizations identified by the District are twofold: (1) Vice Principal Goulding's decision authorizing Amodt to bring his gun onto school property; and (2) Goulding's decision authorizing Eaton (the school drama teacher) to possess and use Amodt's gun for the school play. The latter authorization is admittedly outside the licensing exception, as it involved an internal, operational approval of the acts of an employee by an employer. But the former decision seems to me to clearly qualify, as it conferred on Amodt the permission to do something that would otherwise have been unlawful (the possession of a gun on school premises).

¶ 46 As the majority acknowledges, the Utah Code generally criminalizes the possession of firearms on school campuses. UTAH CODE § 76–10–505.5. The statute recognizes an exception, however, when "the possession is approved by the responsible school administrator." Id. § 76–10–505.5(4)(b). That exception is consistent with the broader outlines of legislative authority in this arena, in which the legislature generally reserves for itself the authority to regulate firearms but delegates limited authority over gun possession to local and state entities.[9]

¶ 47 Thus, when Goulding authorized the possession of Amodt's gun on school premises, he was issuing an authorization that is expressly recognized by statute. And that approval had the hallmark of the government authorizations covered by the licensing exception, in that it gave Amodt permission to do something that was otherwise prohibited by law. When Goulding gave Amodt permission to bring the gun to school, Amodt and his family members were released from criminal liability by the "responsible school administrator." Id. § 76–10–505.5(4)(b). For

me, that is enough to trigger the licensing exception and (presumptively) the School District's immunity.

¶ 48 The majority dismisses this conclusion on the ground that the school administrator somehow lacked the requisite "regulatory authority over the presence of firearms on campus." Supra ¶ 22. But in my view that's exactly the authority the school administrator possessed. The legislature expressly delegated to the "responsible school administrator" the power to exempt from criminal sanctions the possession of a firearm on campus, and that act is the essence of the sort of governmental authorization that triggers the licensing exception.

¶ 49 The school administrator's authority under the criminal law is parallel to the authority given to government officials acting in a prototypical licensing or permitting capacity. A license or permit to operate a source of air pollution, for example, would easily qualify as an approval or authorization covered by the licensing exception.[10] And the hallmark of such licenses or permits is an exemption from a criminal or civil penalty (for emitting air pollution that would otherwise apply).[11]

¶ 50 The school administrator's authority is perhaps distinguishable from the regulatory power sometimes exercised in these parallel fields in that the administrator presumably issues approvals on an ad hoc basis and not under formal regulations or guidelines. But I see nothing in the text of the statute that would limit its scope to authorizations made under generally applicable regulations. Administrative agencies frequently issue authorizations or orders on an ad hoc, case-by-case basis that extend only to individual parties. That authority is expressly recognized in our administrative law.[12] And our prece-

---

9. See UTAH CODE § 53–5a–102(4) ("All authority to regulate firearms is reserved to the state except where the Legislature specifically delegates responsibility to local authorities and state entities.").

10. Id. § 19–2–109.1(2)(a) ("A person may not operate any source of air pollution . . . without having obtained an operating permit" from the Department of Environmental Quality.).

11. Id. § 19–2–115(3)(6) ("A person is guilty of a class A misdemeanor and is subject to imprisonment . . . and a fine of not more than $25,000 per day of violation if that person knowing violates . . . a permit condition.").

12. See, e.g., id. § 63G–4–503(1) ("Any person may file a request for agency action, requesting that the agency issue a declaratory order determining the applicability of a statute, rule, or

dents again have endorsed the treatment of ad hoc licensing as qualifying under the statute, as in *Moss* where we found the Athletic Commission's decision whether to allow a boxer to compete. 2007 UT 99, ¶¶ 14–19, 175 P.3d 1042. Where government agencies exercise that authority, their action falls within the licensing exception just as much as it would if the agency chose instead to issue generally applicable regulations.

¶ 51 Thus, I would hold that the School District issued an authorization that implicates the licensing exception. To answer the question certified to us in this case, however, I would next consider whether the School District's presumptive immunity under the statute extends to plaintiffs' claims for negligence in the training and supervision provided for use of the weapon on school property.

## II

¶ 52 The question certified to us by the federal district court asks "whether Section 301(5)(c)'s approval immunity applies to the facts of this case." Those facts include plaintiffs' allegations of negligence in the training, supervision, and use of the firearm in question and the School District's contention that "plaintiffs' claims arise out of the District's approval of the use of the gun, which constitutes an immune activity under Utah Code Ann. § 63G–7–301(5)(c)."

¶ 53 The majority declines to address issues of causation on the ground that such matters are "not at issue in the certified question before us." *Supra* ¶ 13. I beg to differ. I do not see how we can resolve the question whether the licensing exception "applies to the facts of this case" without assessing the causation argument flagged in the district court's order, which is whether "plaintiffs' claims [of negligence] arise out of the District's approval of the use of the gun." And as I understand the operative terms of the statute, the answer to that question is that it depends on issues of fact not properly before us, as we cannot on this record determine whether and to what extent the death of Tucker Thayer was caused by conduct for which the School District is immune (its ap-

proval of the use of the Amodt weapon) or by conduct for which it is not immune (its subsequent negligence).

¶ 54 We should clarify the legal standards governing that inquiry and leave its resolution to further proceedings in the federal district court. The paragraphs that follow set forth the questions of causation that in my view should guide the resolution of the immunity question presented in this case.

¶ 55 An analysis of the legal cause of a plaintiff's injury is required by the language and structure of the Utah Governmental Immunity Act. The Act first sets forth a general presumption of immunity—that "each governmental entity and each employee . . . are immune from suit for any injury that results from the exercise of a governmental function." Utah Code § 63G–7–201(1). That presumption is then subject to a range of express waivers of immunity, such as that for claims "to any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." *Id.* § 63G–7–301(4). The general waiver of immunity is in turn subject to certain exceptions, including when "the injury arises out of, in connection with, or results from . . . the issuance, denial, suspension, or revocation of . . . any permit, license, certificate, approval, order, or similar authorization." *Id.* § 63G–7–301(5)(c).

¶ 56 The language and structure of these provisions require a careful analysis of the legal cause of an injury alleged to stem from government action. If the government is immune for claims for injuries "proximately caused" by negligence, *id.* § 63G–7–301(4), but not for claims arising out of the issuance of an authorization, *id.* § 63G–7–301(5)(c), the dispositive question is whether the negligence or the authorization is the legal cause of the injury. Thus, in this case the School District should be immune insofar as Tucker Thayer's death was proximately caused by the authorization given to Amodt for the possession of his gun on school premises, but not immune to the extent this tragedy was the proximate result of the District's subsequent negligence.

order within the primary jurisdiction of the agen-      cy to specified circumstances.").

¶ 57 The determination of the legal cause of an injury is necessary to give effect to both the waiver provision and the licensing exception of the Governmental Immunity Act—a move required by our duty to give effect, if possible, to each provision of the code.[13] A failure to determine the legal cause, moreover, would lead to absurd results. Because government regulation is so pervasive, government defendants will often be able to identify a permit or license that is connected in a "but-for" way to the injury in question. In a garden-variety case involving negligence in the operation of a government vehicle, for example, the government could plausibly trace the injury back to the issuance of the employee's driver's license. The fact that the accident would not have happened "but-for" the issuance of that license, however, cannot conceivably qualify the government for immunity. That conclusion would run afoul of the waiver provision, which states unequivocally that immunity is waived for claims for "any injury proximately caused by a negligent act or omission of an employee committed within the scope of employment." *Id.* § 63G–7–301(4).[14]

¶ 58 To avoid this absurdity and to preserve meaning for both the negligence waiver and the licensing exception, I would interpret the Governmental Immunity Act to call for a determination of the proximate cause of the injury in question. Thus, the mere identification of a government approval under the licensing exception would not cloak all subsequent acts in blanket immunity. (If that were enough, the School District would not have to rely on the issuance of its authorization of use of Amodt's gun; it could simply identify an earlier permit issued at the time of the gun's initial purchase, which is likewise connected in a but-for way to the accident in question.) Instead, immunity under the li-

censing exception would be invoked only to the extent the government authorization was the proximate cause of the injury and was not overtaken by a superseding act of negligence.

¶ 59 Granted, our cases have sometimes endorsed a broad conception of the "arises out of" clause in the Governmental Immunity Act. In *Taylor ex rel. Taylor v. Ogden City School Dist.*, for example, we suggested that the "arises out of" clause in the Governmental Immunity Act required only " 'some' causal relationship" between the injury and the conduct for which the government is immune. 927 P.2d 159, 163 (Utah 1996). In so doing, we repudiated any requirement that the immune conduct "be the sole cause of the injury to except the governmental entity from liability for the injury." *Id.* Our analysis in *Ledfors v. Emery County School District*, 849 P.2d 1162 (1993), was similar. There we interpreted the "arises out of" clause to foreclose "attempts to evade" governmental immunity through arguments "recharacterizing the supposed cause of the injury" to focus on the government's negligence rather than its immune conduct. *Id.* at 1166.

¶ 60 These cases, however, cannot properly be read to foreclose an evaluation of the legal cause of an injury.[15] *Taylor* and *Ledfors* were easy cases involving uncontroversial fact-patterns in which there could be no question that the alleged acts of negligence did not supersede the causal connection to conduct for which the government was immune. In both cases, the immune acts came after the government's alleged negligence. Both cases involved an assault on a student by another student (an act for which the government was immune, *see* Utah Code § 63G–7–301(5)(b)), and antecedent negligence in failing to maintain a safe public

---

13. *See Lieber v. ITT Hartford Ins. Ctr.*, 2000 UT 90, ¶ 9, 15 P.3d 1030 ("[A] statute should be construed as a whole, with all of its provisions construed to be harmonious with each other." (internal quotation marks omitted)).

14. The parade of horribles would not end here, moreover. Many government actors owe their positions to the issuance of government permits, licenses, certificates, or orders. Those authorizations, in turn, are a but-for cause of any subsequent injuries they cause. That fact cannot con-

ceivably defeat the waiver of immunity for the negligent acts of the government. We can avoid that problem by interpreting the Governmental Immunity Act to require an inquiry into the legal cause of the injury in question.

15. *C.f. Francis v. State*, 2010 UT 62, ¶ 17, 248 P.3d 44 (declining to extend the "but for" cause analysis to the Licensing Exception and confining it to the Assault Exception).

building[16] or failing to supervise the students.[17] In these circumstances, it is easy to understand why the court so easily concluded that the assault and not the antecedent negligence was the legal cause of the injury. The immune conduct (the assault) happened last, and thus it could not have been superseded by any subsequent act of negligence.

¶ 61 A superseding cause is an unforeseeable act of subsequent negligence that severs the causal connection to an initial causal act.[18] In *Taylor* and *Ledfors*, it could not be said that the government's negligent maintenance or supervision superseded the assaults because the former acts preceded the assaults. Those antecedent acts accordingly were not only foreseeable but actually known, and they could not conceivably have severed the causal chain to the immune acts associated with the assaults.

¶ 62 This case is not so easy. Here the act for which the government is immune (the authorization) happened first, so there is a legitimate question whether that act is superseded by the District's alleged subsequent negligence (for which it is not immune). That conduct would supersede (and cut the causal chain to the authorization) if the alleged subsequent negligence was sufficiently unforeseeable—e.g., if "a reasonable man knowing the situation" would regard the subsequent negligence as "highly extraordinary" and not a "normal consequence" of the situation created by the authorization.[19] That question, of course, is not before us here. But a complete answer to the certified question should include a reference to this issue, leaving its resolution for further proceedings in the federal district court.

¶ 63 Even if the District's alleged subsequent negligence is not a superseding cause that would still leave the question of how to allocate liability as between an immune act (issuance of a government approval) and a non-immune act (subsequent negligence). In my view, that question should be answered by importing another tool of liability apportionment from tort law—comparative negligence. As with superseding cause analysis, this doctrine typically is utilized to apportion liability between all plaintiffs and multiple tortfeasors. But that function is likewise suitable to the apportionment of liability between two acts of a single tortfeasor where only one of those acts is actionable (and the other is not, due to immunity).

¶ 64 Under Utah's comparative negligence statute, the fact finder is to allocate "the percentage or proportion of fault attributable to each person seeking recovery, to each defendant, to any person immune from suit, and to any other person . . . for whom there is a factual and legal basis to allocate fault." UTAH CODE § 78B–5–818(4)(a). In this case, the School District is potentially both a "defendant" and a "person immune from suit" under the statute. A "defendant" is defined as "a person, other than a person immune from suit . . . who is claimed to be liable because of fault." *Id.* § 78B–5–817(1). The District is a fault-based defendant to the extent it caused harm by its non-immune acts

---

**16.** See *Taylor ex rel. Taylor v. Ogden City Sch. Dist.*, 927 P.2d 159, 160 (Utah 1996) (noting that plaintiff's claim arose out of an incident in which a middle school student pushed another student into a glass window, and that the alleged negligence was a "failure to install safety glass in the window of the bathroom or institute some other safety measure that would have prevented" the injury).

**17.** See *Ledfors v. Emery Cnty. Sch. Dist.*, 849 P.2d at 1162, 1163 (Utah 1993) (explaining that the case arose from an assault by two students on another and alleged negligence "in failing to supervise" the students' class "and in allowing the two students to roam the halls").

**18.** See *Mitchell v. Pearson Enters.*, 697 P.2d 240, 245 (Utah 1985) (proximate cause is "that cause which, in natural and continuous sequence (unbroken by an efficient intervening cause), pro-

duces the injury and without which the result would not have occurred"); *Harris v. Utah Transit Auth.*, 671 P.2d 217, 219 (Utah 1983) (quoting the Restatement (Second) of Torts § 447 (1965) for the proposition that an intervening act of negligence is not a superseding cause if "(a) the actor at the time of his negligent conduct should have realized that a third person might so act, or (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent").

**19.** *Harris*, 671 P.2d at 219.

of negligence. And it is also "a person immune from suit" insofar as it caused injury by its authorization of the use of Amodt's gun.

¶ 65 Apportionment of fault between the immune and non-immune acts of the School District would thus be required under the terms of the statute. If the proceedings in the federal district court determine that the combined fault of all defendants and persons immune from suit exceeds any alleged fault of the plaintiff, the plaintiff may recover. *Id.* § 78B–5–818. In that case, the School District in its role as a defendant would be liable, but its responsibility for the injury would be limited to the "percentage or proportion of the damages equivalent to the percentage or proportion of fault attributed to" the negligent acts of the School District. *Id.* § 78B–5–820(1).

¶ 66 The apportionment and superseding cause questions cannot be resolved on the record before us. They turn on underlying questions of fact that we should not and cannot resolve on certification from the federal court. But these are key questions in resolving the School District's immunity, and in my view our opinion on the certified question should flag these issues for resolution at an appropriate point in the federal court.

### III

¶ 67 I understand the impulse against recognizing immunity for the School District in this case. Tucker Thayer's death was tragic, and our human tendency in the face of tragedy is to identify and censure its cause.

¶ 68 The decision to deny immunity for the School District, moreover, may ultimately be the correct outcome. But the question of immunity, in my view, turns on questions of fact that are not properly before us. We should not short-circuit that result by distorting the scope of the licensing exception in the Governmental Immunity Act.

¶ 69 A license, approval, or similar authorization should encompass ad hoc, informal authorizations made by the government that empower the recipient to engage in behavior that would otherwise be unlawful. If this were a case seeking to impose liability on the government for making such an approval (and nothing else), I suspect that is precisely the conclusion we would be reaching. That is also the decision we should be making here, with the caveats noted above regarding superseding cause and comparative negligence. I respectfully dissent because I think the court's analysis is irreconcilable with the language and structure of the statute and because it will sow the seeds of confusion in future cases.