**2015 UT 75**

IN THE

**SUPREME COURT OF THE STATE OF UTAH**

KENDALL UTLEY, an individual,
*Appellee,*

*v.*

MILL MAN STEEL, INC., a Colorado corporation,
*Appellant.*

No. 20130162

Filed August 20, 2015

Third District, Salt Lake Dep't
The Honorable John Paul Kennedy
No. 110901007

Attorneys:

Andrew Stavros, Austin B. Egan, Salt Lake, for appellee

Bryce D. Panzer, Michael S. Wilde, Salt Lake, for appellant

ASSOCIATE CHIEF JUSTICE LEE authored the opinion of the court with respect to Part I and Part II.A, in which JUSTICE PARRISH and JUSTICE HIMONAS joined, and the judgment of the court with respect to Part II.B, in which JUSTICE HIMONAS joined.

CHIEF JUSTICE DURRANT authored an opinion concurring in part and dissenting in part in which JUSTICE DURHAM joined in full and JUSTICE PARRISH joined as to Part I.

ASSOCIATE CHIEF JUSTICE LEE, opinion of the court as to Part I and Part II.A and concurring in the judgment of the court as to Part II.B.:

¶1   Mill Man Steel fired Kendall Utley on suspicion that he had misappropriated steel from the company. In so doing, Mill Man refused to pay Utley the commissions he claimed to have earned, asserting a right to withhold the commissions as an offset against the value of the allegedly misappropriated steel. Utley filed this suit, claiming that Mill Man had violated the Utah Payment of Wages Act (UPWA). The district court granted summary judgment for Utley. It held that Mill Man was required to pay Utley his commissions and that Mill Man could not qualify under a UPWA provision allowing an employer to withhold earned wages upon "present[ing] evidence that in the opinion of a hearing officer . . . would warrant an offset." UTAH CODE § 34-28-3(5)(c) (2013).[1]

¶2   We reverse. We interpret this provision to allow Mill Man to present evidence to the district court in an attempt to establish that Utley's misappropriation "would warrant an offset" justifying Mill Man's failure to pay Utley's commissions. A contrary ruling would render the subsection (5)(c) exception a practical nullity. We avoid that result by interpreting the statute to allow an employer in a case like this one to seek a post-withholding opinion of a court or administrative law judge that an offset was warranted. Such employer does so at its peril, however. If the offset is not found to be warranted, the employer will be subject to liability and penalties under the UPWA.

I

¶3   In July 2009, appellant Mill Man hired Kendall Utley as a sales and purchasing agent to sell its steel plate and coil. A short time later, Utley opened a Mill Man office in Pleasant Grove, at the site of one of Utley's existing customers, Rocky Mountain Welding (RMW). Under the employment arrangement with Utley,

---

[1] The UPWA was amended in May 2014. We refer throughout our opinion to the version of the statute in effect at the time of Mill Man's withholding.

Mill Man sent inventory to the RMW location and Utley was paid on a commission basis. About a year later, however, Mill Man went to the RMW site for an inspection and discovered that some 700 tons of steel—roughly 40 percent of the logged inventory—was missing. The value of the missing steel allegedly was about $370,000. Mill Man promptly fired Utley.

¶4   Prior to his termination, Utley sold amounts of steel that purportedly entitled him to commissions totaling $100,479.99. Shortly after Mill Man fired Utley, however, it informed him that it would not pay any of his outstanding commissions but was retaining them to offset its losses. Utley then filed suit claiming breach of contract and a violation of the Utah Payment of Wages Act. Mill Man raised affirmative defenses and counterclaims, including recoupment and offset, breach of fiduciary duty, conversion, fraud, and imposition of a constructive trust.

¶5   Utley moved for summary judgment. Mill Man opposed the motion, arguing that it did not owe Utley his commissions due to his breach of fiduciary duty and, alternatively, that Mill Man was due an offset under the UPWA in the amount of $370,000 because of Utley's negligence.

¶6   The district court granted summary judgment in favor of Utley. It was undisputed that Utley was owed $100,479.99 in commissions. And in the district court's view, the UPWA did not permit a preemptive withholding of these commissions. Thus, the district court concluded that Mill Man was required to pay Utley his commission under the terms of the UPWA. It also imposed a penalty on Mill Man to the tune of some $50,000. In all, the district court awarded Utley $205,262.37.

¶7   Mill Man appealed. We review the summary judgment decision below de novo, yielding no deference to the district court. *See, e.g.*, *Bahr v. Imus*, 2011 UT 19, ¶¶ 12–18, 250 P.3d 56.

II

¶8   The UPWA provides that "[w]henever an employer separates an employee from the employer's payroll the unpaid wages of the employee become due immediately, and the employer shall pay the wages to the employee within 24 hours of the time of separation at the specified place of payment." UTAH CODE § 34-28-5(1)(a). An employer who fails to make this payment in this timeframe, moreover, is guilty of unlawfully withholding wages

under the UPWA. *Id.* § 34-28-12(1). And the sanctions for unlawful withholding are significant, including not only a statutory fine,[2] but even criminal liability.[3]

¶9    This case implicates an exception to the general rule. Under the exception, withholding of wages is permitted where "the employer presents evidence that in the opinion of a hearing officer or an administrative law judge would warrant an offset." *Id.* § 34-28-3(5)(c). This exception is one in a series. The others listed in the statute allow an employer to withhold earned wages where "the employer is required to withhold or divert the wages" because of a court order or state or federal law; "the employee expressly authorizes the deduction in writing"; or "the employer withholds or diverts the wages" in accordance with certain authorized retirement plans. *Id.* § 34-28-3(5)(a), (b), & (d).

¶10  Mill Man claims a right to invoke the subsection 5(c) exception in this case. It asserts that Utley's misappropriation of its steel is a matter that "would warrant an offset" against his commissions, and finds error in the district court's refusal to allow it to present evidence in support of that claim. Utley defends the district court's decision on two grounds: (a) that the statute requires an employer to secure an "opinion" as to the viability of an offset *before* withholding any wages; and (b) that a district court judge is not a "hearing officer" under the terms of the UPWA. We disagree on both counts, and reverse and remand for further proceedings.

A

¶11  Utley first defends the district court's decision on timing grounds. He claims that subsection 5(c) is unavailable because this

---

[2] UTAH CODE § 34-28-5(1)(b) (providing for a penalty of up to sixty days' wages at the employee's then-current rate).

[3] *Id.* § 34-28-12(1) (providing that employer who "violate[s], or fail[s] to comply with" the UPWA "shall be guilty of a misdemeanor"); *id.* § 34-28-12(2) (employer who "refuse[s] to pay the wages due and payable when demanded" or "falsely den[ies] the amount thereof, or that the same is due" with the intent to secure a discount or the intent to "annoy, harass, oppress, hinder, delay or defraud," is "guilty of a misdemeanor").

provision makes the opinion of the hearing officer a *precondition* to the right of the employer to withhold. Utley bases this position on two grounds: (1) the terms of the exception—specifically the proviso that the exception allowing withholding is not available "unless" the employer presents evidence that is deemed by the hearing officer to "warrant an offset," UTAH CODE § 34-28-3(5)(c), and (2) the structure of the statute—the fact that the other, parallel exceptions in the UPWA appear to be *preconditions*. We find neither point persuasive, and accordingly reject this basis for foreclosing Mill Man's reliance on subsection 5(c).

1

¶12 The term "unless" is one of condition. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2503 (2002) (defining "unless" as "except on the condition that"); AMERICAN HERITAGE DICTIONARY 1402 (2d ed. 1981) (same). But without more, the conditional construct of this term does not impose a *temporal* limitation. We can easily speak of *unless* conditionality without reference to timing, as in a parent's condition to a child that "you may not take the car unless you fill it with gas."

¶13 Granted, *unless* conditionality is *sometimes* temporal. Depending on context, the child subject to the above requirement might properly understand it as a *precondition*. That might hold, for example, if everyone knows that the car's gas gauge is currently on empty. But context could also eliminate the timing element—and leave only the condition. That, in fact, might be the better interpretation of the parent's directive to fill the car with gas in certain circumstances. If the car has plenty of gas in it for the child's errand, presumably the parent would prefer that the tank be filled *after* the child uses it. And in that circumstance "unless" would properly be understood as a condition, but not a *precondition*.

¶14 In our view, the same holds for the "unless" condition in subsection 5(c) of the UPWA. We interpret the term "unless" in subsection 5 as merely expressing a condition (without any suggestion as to *timing*).[4] That conclusion follows, as explained be-

---

[4] The dissent challenges our approach as somehow attributing two different meanings to "unless," depending on its application

(continued . . .)

low, from the relevant surrounding circumstances—specifically, from the legal and practical context of the statute's operation, which render the operation of the 5(c) exception a practical nullity under Utley's approach.

¶15 Under Utley's interpretation of the statute, an employer wishing to withhold wages on the basis of a claim of an offset must *first* file a pre-withholding legal proceeding *and* convince a hearing officer to render an "opinion" that the employer's "evidence . . . would warrant an offset." UTAH CODE § 34-28-3(5)(c). As we understand the statutory scheme, however, these *preconditions* are a barrier that few if any litigants could overcome—at least within the 24-hour period in which an employer is required to pay wages after termination. We know of no mechanism in the statutory or regulatory scheme under the UPWA that would allow an employer to withhold under subsection 5(c) while still protecting itself from liability for unlawful withholding. And the absence of such a mechanism would render the 5(c) exception a nullity under Utley's interpretation. We reject that interpretation on that basis. *See VCS, Inc. v. Utah Community Bank*, 2012 UT 89, ¶ 18, 293 P.3d 290 (rejecting an interpretation of a statute because it ran "afoul of the settled canon of preserving independent meaning for all statutory provisions").

¶16 The wheels of justice can occasionally be put in motion in a hurry, as by entry of a stay or a temporary restraining order. But an employer with an obligation to pay a terminated employee within 24 hours (without withholding any "offset" amount) would be hard-pressed to secure a judge's "opinion" on evidence of an offset within that narrow timeframe.

---

to the statute's listed exceptions. *Infra* ¶ 31. This misunderstands our position. We do not conclude that "unless" has "a different meaning as applied to subsection (c) than it has as applied to subsections (a), (b), and (d)." *Infra* ¶ 31. Instead, we hold that "unless" is used consistently in the sense of a mere condition (without a timing element). That sense applies across the board to all of the listed objects of "unless" conditionality. The fact that some of the listed objects will usually be satisfied before the withholding changes nothing. The term "unless" still conveys the simple—and consistent—notion of mere conditionality.

¶17 None of the options presented by the dissent, *infra* ¶¶ 8–80, is viable. The notion of a "preliminary finding," *infra* ¶ 80, based on a "threshold showing" or a "proffer of evidence," *infra* ¶ 79, would require the development of a new procedural mechanism unknown by our current rules of civil procedure. We see no basis for inferring a "legislative intent" to require our courts to establish such a *sui generis* proceeding. *Infra* ¶ 79. To alter our civil rules in this way, the legislature would have to do more than vaguely intend to do so. It would have to follow the constitutional prerequisites for amending the rules of this court. *See* UTAH CONST. art. VIII, § 4 (requiring a two-third majority vote of both houses in order for the legislature to amend rules of procedure that have been adopted by the Utah Supreme Court). In the absence of such a move by the legislature, we cannot lightly presume that it intended to embrace the novel procedural mechanism imagined by the dissent.

¶18 Our rules do encompass means for preliminary, non-final decisions—in the limited circumstance of entry of a stay, UTAH R. CIV. P. 62, or of entry of a temporary restraining order or preliminary injunction, *id.* at 65A. But none of these mechanisms is viable here.

¶19 A "stay" is a misfit. An employer seeking to invoke the subsection 5(c) exception would not be seeking to halt a judgment or the implementation of a law. *See Id.* at 62. (providing for stays of execution of judgments, stays pending appeal, and injunctions pending appeal). It would be seeking an "opinion" on the merits of a pending case; and that is not the function of a stay.

¶20 A "preliminary injunction," *see infra* ¶ 81, is both ill-suited and practically unavailable in the 24-hour timeframe established by statute. An employer would be hard-pressed, in a case where mere money is at stake, to make the showing of irreparable harm that is necessary to sustain entry of a preliminary injunction. *See* UTAH R. CIV. P. 65A(e)(1) (requiring applicant to show that "irreparable harm" will occur absent an injunction); *Hunsaker v. Kersh*, 1999 UT 106, ¶ 9, 991 P.2d 67 ("Irreparable injury justifying an injunction is that which cannot be adequately compensated in damages *or* for which damages cannot be compensable in money." (internal quotation marks omitted)). And even if such a showing

could be made, it would be difficult, at best, to do so within the 24-hour time period mandated by the UPWA.

¶21 Granted, an "[e]x parte motion[] for emergency relief" could conceivably be resolved within a 24-hour period. *Infra* ¶ 81. But a merits-based "opinion" on the legal viability of an offset could hardly be entered on an ex parte basis. Surely, an adversary preliminary injunction hearing would be required. And the odds of such a hearing being noticed, held, and resolved within 24 hours are long (if not impossible). The "stay" imagined by the dissent is no legitimate answer. *Infra* ¶ 81. It would be highly anomalous for the *usual operation* of a statutory exception to require the entry of a preliminary injunction and stay blocking enforcement of the core requirement of the statute—all within 24 hours.

¶22 The practical difficulty associated with the heroic procedural measures proffered by the dissent persuades us to reject Utley's construction of the "unless" condition in section 5. If an employer cannot reasonably withhold wages under subsection 5(c) before a court renders an opinion through the ordinary course of litigation, the better view is that "unless" is not a *precondition*. We adopt that construction on the ground that it avoids the effective nullification of the employer's right to withhold based on a judge's determination that the employer's evidence "warrant[s] an offset." UTAH CODE § 34-28-3(5)(c).

¶23  As Mill Man has suggested, the UPWA can easily be interpreted to subject employers to penalties and sanctions for unlawful withholding if they are later deemed to have withheld amounts that do not "warrant an offset" in the judge's "opinion." That is a better interpretation of the statute than one that renders one of its provisions a nullity.

¶24  The potential for criminal liability is no barrier to our view of the statute, or for overriding its terms on the basis of a supposed absurdity. *See infra* ¶ 76. Granted, the statute "makes no exception for good-faith counterclaims that the employer is later unable to prove in court." *Infra* ¶ 76. And the risk of criminal liability attaches "the moment a court rules in the employee's favor" under the UPWA, "even in a close case where the employee satisfies the preponderance of the evidence standard only by the narrowest of margins." *Infra* ¶ 76. But the legislature apparently decided that the threat of criminal liability was important—as a deterrent

to an employer's violation of the statute. Without an element of bad faith, moreover, the dissent is right that the potential for criminal liability arises whenever an employer is found to have violated the statute.

¶25 That does not mean that criminal charges would be brought in every case, however. One response to the dissent's concern is to recall the buffer that is provided by the mechanism of prosecutorial discretion. A prosecutor would presumably be inclined to withhold criminal charges in a case in which the employer's withholding is made in good faith but rejected on the "narrowest of margins."

¶26 In any event, the dissent's proffered solution does nothing to solve its concern regarding criminal liability. An employer that is *preliminarily* deemed entitled to withhold wages but *ultimately* found in violation of the statute has a strong basis for asserting that it acted in good faith. But such an employer would still be subject to criminal liability for "fail[ing] to comply with" a provision of the UPWA. UTAH CODE § 34-28-12(1). So under either interpretation of the subsection 5(c) "unless" proviso, an employer must "risk criminal liability in order to pursue a good-faith counterclaim." *Infra* ¶ 76. Thus, the potential for such liability is no basis for favoring Utley's view; it is simply a strong disincentive for an employer to advance a meritless claim of a right to withhold wages.

2

¶27 The structure of the UPWA does not support Utley's approach. As Utley indicates, other exceptions in subsection 5 may be considered in resolving ambiguities in subsection 5(c). But the terms of those exceptions cannot properly be read to impose a temporal condition on the 5(c) exception.

¶28 Granted, the other subsection 5 exceptions appear to be formulated in terms that may be satisfied before an employer's withholding. UTAH CODE § 34-28-3(5)(a), (b), & (d) (providing exceptions for withholding under a court order or statute, an authorization signed by an employee, and in accordance with an approved retirement plan). But we cannot agree that these provisions impose a similar restriction on subsection 5(c) under the *noscitur a sociis* canon of construction. *See infra* ¶¶ 17–18.

¶29 First, semantic canons are not rigid rules of construction; they are only presumptive principles of ordinary usage.[6] Such principles may easily be rebutted by contrary indications of statutory meaning in context. And here we have a strong contrary indication—in the indisputable fact that the proposed use of the *noscitur* canon effectively eviscerates an entire provision of the statute.[7]

¶30 Second, the *noscitur* canon is inherently dependent on a threshold—and often subjective—judicial assessment of the "'common feature'" of the terms from which the court attempts to "'extrapolate meaning.'" *Infra* ¶ 68 (quoting *Thayer v. Washington Cnty. Sch. Dist.*, 2012 UT 31, ¶ 15, 285 P.3d 1142). And that element sometimes renders this canon indeterminate, as where the relevant "common attribute" in question is open to debate. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225–26 (2008) (rejecting the utility of the *noscitur* canon on this basis).[8] That is the case here.

¶31 On one hand, the common feature of the subsection 5 exceptions could be (as the dissent says) a matter of timing. *Infra* ¶ 70 (asserting that the other exceptions in section 5 "permit a withholding only if the employer receives some form of authori-

---

[6] *See Thayer v. Washington Cnty. Sch. Dist.*, 2012 UT 31, ¶ 37, 285 P.3d 1142 (Lee, J., dissenting) (noting that "[c]anons of construction are not universal rules of grammar or syntax," but "rules of thumb that provide potentially useful cues for resolving ambiguity in written text").

[7] *See id.* ("[A] recognized exception to the *noscitur* principle acknowledges that a term of broad application should *not* be narrowed by its neighboring text when its broad meaning is clear.") (emphasis in original); *Russell Motor Car Co. v. United States*, 261 U.S. 514, 519 (1923) (holding that *noscitur a sociis* is "not an invariable rule, for [a] word may have a character of its own not to be submerged by its association").

[8] *See also Yates v. United States*, 135 S. Ct. 1074, 1098 (2015) (Kagan, J., dissenting) (noting that the *noscitur* canon can be manipulated to "switch on and off whenever convenient" in selecting a common feature that ties a group of words together).

zation *before* the withholding takes place"). But that is not the only way to think of the items in the list. Another is to note that each of the exceptions is framed in a manner facilitating the employer's decision to withhold in the limited time available prior to termination. Thus, to withhold amounts dictated by state or federal law, by court order, or as agreed to by the employee, the employer has all the information it needs at the time of termination. But that does not hold for a withholding based on "evidence that in the opinion of a hearing officer or an administrative law judge would warrant an offset." UTAH CODE § 34-28-3(5)(c). The authority to withhold on that basis necessarily requires subsequent developments—the filing of a legal claim, and the acquisition of the "opinion" of a judge that the evidence "warrant[s] an offset." *Id.*

¶32  The *noscitur* canon cannot tell us which of these common features is more significant. Yet the statute itself does. It does so by including subsection 5(c) as a separate, viable withholding exception. We credit that clear indication of statutory meaning over the vague assertion that the *noscitur* canon requires us to override it.

¶33  In so doing, we reject Utley's insistence (echoed repeatedly by the dissent) that our conclusion flies in the face of the "central purpose of the UPWA—to ensure the prompt payment of earned wages." *Infra* ¶ 45.[9] That is certainly *a* purpose of the statute. But we find no basis for concluding that this was the legislature's *only* purpose, or that it sought to vindicate this "central purpose" at the expense of all other concerns.

¶34  As we have emphasized frequently, "[l]egislation is rarely aimed at advancing a single objective at the expense of all others." *Myers v. Myers*, 2011 UT 65, ¶ 27, 266 P.3d 806. "More often, statutes are a result of a legislative give-and-take that balances multi-

---

[9] *See also infra* ¶ 45 (asserting that our conclusion "frustrates the central purpose of the UPWA"); ¶ 65 ("the majority turns the essential purpose of the statute on its head"); ¶ 66 (referring to the "central concern animating the UPWA"); ¶ 69 ("The statute's central purpose is to require employers to promptly pay wages unless they can justify nonpayment."); ¶ 74 ("[T]he Act's central purpose is to assure that employees receive prompt payment of earned wages.").

ple concerns." *Id*.[10] Here the relevant concerns encompass the employer's interest in withholding wages under the exceptions set forth in section 5. We must account for that purpose as well, for it is as much expressed in the statute's text as is the purpose of ensuring timely payment of wages to employees *See Graves v. Ne. Servs., Inc.*, 2015 UT 28, ¶ 67, 345 P.3d 619 ("[T]he governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment."). We reject Utley's view of the subsection 5(c) exception because it elevates the purpose of protecting employees in a manner that effectively nullifies the employer's right to withhold in circumstances warranting an offset.

B

¶35 Utley also contends that the subsection 5(c) exception was not available in this proceeding because the district court judge lacked the statutory authority to implement it. The exception requires an "opinion of a hearing officer or an administrative law judge" regarding the viability of an offset. UTAH CODE § 34-28-3(5)(c). And because in Utley's view a district court judge is neither a "hearing officer" nor an "administrative law judge," the exception could not be invoked in a case like this one.

¶36 Utley's argument has some facial plausibility in the text of the statute. Certainly a district court judge is not an "administrative law judge." And "hearing officer," if read in isolation, might more naturally be understood to have reference to an officer pre-

---

[10] *See also McArthur v. State Farm Mut. Auto. Ins. Co.*, 2012 UT 22, ¶ 14, 274 P.3d 981 (recognizing that "most all" statutory provisions "represent an attempt by the legislature to balance competing policy considerations, not to advanc[e] a single objective at the expense of all others" (alteration in original) (internal quotation marks omitted)); *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 & n.6, 248 P.3d 465 (noting "the peril of interpreting statutes in accordance with presumed legislative purpose," while emphasizing that "most statutes represent a compromise of purposes advanced by competing interest groups, not an unmitigated attempt to stamp out a particular evil").

siding over an administrative proceeding. *See* BLACK'S LAW DICTIONARY 790 (9th ed. 2009) (providing "administrative-law judge" as one definition of "hearing officer").

¶37 That said, we do not interpret the terms of statutory provisions in isolation. We read them in context. *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465. The relevant context, moreover, must include an understanding of the structure and purpose of the statute. *Id.* And here that context persuades us to construe the statutory reference to "hearing officer" to encompass district court judges. We reach that conclusion (a) because it is a linguistically plausible reading of the text of the statute and (b) because a contrary reading would lead to absurd results that cannot have been intended by the legislature.

¶38 There is a sense in which a district court judge can be thought of as a "hearing officer." We regularly refer to judges as "judicial officers."[11] And of course a typical responsibility of such an officer is to preside over hearings. It is not unheard of, moreover, for the law to use the terminology of "hearing officer" in a manner encompassing district judges.[12]

---

[11] *See, e.g.*, UTAH CONST. art. VI, § 19 ("Judicial officers shall be liable to impeachment for high crimes, misdemeanors, or malfeasance in office. . . ."); UTAH CODE § 20A–1–102(38) (defining "judicial officer" for purposes of the election code as "any justice or judge of a court of record or any county court judge"); *id.* § 78A–2–218 (listing powers of "[e]very judicial officer"); *State v. Deherrera*, 965 P.2d 501, 505 (Utah Ct. App. 1998) ("[T]he judge approving the plan, as a judicial officer, had an obligation to examine the entire plan in terms of the statutory requirements.").

[12] *See State v. Orr*, 2005 UT 92, ¶ 20, 127 P.3d 1213 (implicitly characterizing district court judges as "hearing officers," in the context of a determination that a district judge satisfies the due process requirements for a probation modification proceeding under *Gagnon v. Scarpelli*, 411 U.S. 778 (1973)—requirements including the "right to confront and cross-examine adverse witnesses[,] unless the *hearing officer* specifically finds good cause for not allowing confrontation" (emphasis added) (internal quotation marks omitted). While the "hearing officer" in a parole revocation proceeding may be an appointee of an administrative agency,

(continued . . .)

¶39 We concede that this is not the most common use of the term "hearing officer." That phrase is used as a term of art in administrative law. And in that field, "hearing officer" is often understood to refer to an agency-appointed official who presides over an administrative hearing.[13] We reject that interpretation here, however, because it would nullify the subsection 5(c) exception—by producing absurdities that could not have been intended by the legislature.[14]

---

probation modification or revocation proceedings take place in Utah *only* in district court. UTAH CODE § 77-27-5(1)(a) (granting Board of Pardons and Parole authority to handle parole matters, but not probation matters). In this context our Utah cases have used the terminology of "hearing officer" in a manner implicitly encompassing district judges. *See Morishita v. Morris*, 621 P.2d 691, 694 (Utah 1980) (Wilkins, J., dissenting); *State v. Tate*, 1999 UT App 302, ¶¶ 10–12, 989 P.2d 73; *Layton City v. Peronek*, 803 P.2d 1294, 1299 (Utah Ct. App. 1990); *State v. Hodges*, 798 P.2d 270, 273 (Utah Ct. App. 1990). And that is a perfectly acceptable, though not the most common, way of using that phrase.

[13] *See* UTAH ADMIN. CODE R610-3-2(G). *But see Hughes Gen. Contractors, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 25, 322 P.3d 712 (holding that Utah courts do not defer to administrative agency interpretations of statutes).

[14] The dissent rightly distinguishes the "absurd consequences canon" from the "absurdity doctrine." *Infra* ¶ 47. As the dissent notes, the latter—involving judicial construction of a statute that overrides the "plain meaning" of its text—is "'strong medicine, not to be administered lightly.'" *Infra* ¶ 48 (quoting *Cox v. Laycock*, 2015 UT 20, ¶ 71, 345 P.3d 689 (Lee, J., concurring)). But this doctrine is limited to cases where the legislative text is unmistakably clear, or in other words where "there is *no* sense of a provision— *no* permissible meaning—that can eliminate an absurdity unless the court fixes a textual error." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 234 (2012) (citing the example of a "provision in a statute creating a new claim by saying that 'the winning party must pay the other side's reasonable attorney's fees"), *id.* at 235; *see also, e.g., Cer-*

(continued . . .)

¶40 Utley's reading would render subsection 5(c) void for claims of $10,000 or more. Such high value claims must be brought in district court. *See* UTAH CODE § 34-28-9(1)(d). Thus, under the administrative law notion of "hearing officer," an employer facing claims for unpaid wages of $10,000 or more would be legally prohibited from withholding wages on the basis of an

---

*nauskus v. Fletcher*, 201 S.W.2d 999, 1000 (Ark. 1947) (refusing to read literally a provision which read "[a]ll laws and parts of laws, and particularly Act 311 of the Acts of 1941, are hereby repealed" because "[n]o doubt the legislature meant to repeal all laws in conflict with that act, and, by error of the author or the typist, left out the usual words 'in conflict herewith,' which we will imply by necessary construction"). And we do not view this case as falling into this category. The *better* reading of the literal text, read in isolation, would be to exclude judicial proceedings before a district court judge. But this is not a case where "there is *no* sense" of subsection 5(c)—"*no* permissible meaning"—that can encompass a district judge. Here there is at least a degree of ambiguity, so the question is not one of overriding text that is unmistakably clear. *See infra* ¶ 57 (implicitly acknowledging at least an "obscure understanding of 'hearing officer'" encompassing district judges). For that reason we view this as a case for the absurd consequences canon, not the absurdity doctrine.

This is not a case, in other words, where the absurdity is so strong that we would override unmistakably clear language contradicting it. If the legislature had expressly limited the subsection 5(c) exception to "cases filed in an administrative proceeding only, and not those filed in the district court," we would follow the statutory text. Such a statute would be strange, for all of the reasons noted above, but not so *absurd* that we could override the clear terms the legislature enacted into law.

That said, our position is not far from that of the dissent. We recognize that our construction of "hearing officer" is not the ordinary or term-of-art sense of the term. *See infra* ¶ 60. We emphasize, moreover, that we do not depart from the more natural sense of the statutory text lightly; we do so only in light of a strong conviction that that sense of the statute would yield consequences that are so troubling that we cannot reasonably attribute them to the legislature.

offset. We can think of no rational basis for the legislature to adopt such a restriction on an employer's right to an offset. If anything, an offset would seem to be more important—and more likely—in a case of a high value wage claim. It would be oddly perverse for the legislature to foreclose the employer's right to withhold under 5(c) in the cases where that right would be most important.

¶41 The administrative law notion of "hearing officer" would leave open the possibility of an offset in a UPWA case for wages under $10,000. But a strategic employee facing a threat of an offset could block the offset by filing in district court—an option available by statute. *Id.* § 34-28-9-(1)(a)(iii). So even for lower value claims the subsection 5(c) exception would be a practical dead letter.

¶42 These problems persuade us that the legislature could not have intended to limit "hearing officer" to its narrow meaning in administrative law. In the absence of some rational basis for the legislature to limit an employer's right of offset to lower value claims where the employee fails to file in district court, we conclude that the legislature must have employed "hearing officer" in its broader sense encompassing district judges.

III

For the above reasons we reverse the entry of summary judgment in Utley's favor and remand for further proceedings in the district court. Such proceedings, among other things, may be addressed to the determination whether Mill Man has presented evidence that in the opinion of the district court "would warrant an offset" sufficient to justify Mill Man's withholding of Utley's unpaid commission.

— — — — — — —

CHIEF JUSTICE DURRANT, concurring in part as to Part II.B of ASSOCIATE JUSTICE LEE's opinion and dissenting as to Part II.A:

¶43 This case presents us with two questions: (1) whether the legislature intended to mean "district court judge" when it used the term "hearing officer" in the UPWA, and (2) whether an employer may unilaterally withhold wages without first seeking authorization from an administrative law judge or a hearing officer.

¶44 As to the first question, we conclude that the term "hearing officer" is unambiguous and does not encompass "district court judge." But because interpreting the statute in that manner leads to results so patently absurd no reasonable legislator could have intended them, we reform the statute under the absurdity doctrine to read "hearing officer, administrative law judge, or district court judge." The lead opinion reaches the same result on this issue, but does so by concluding that the term "hearing officer" is ambiguous and applying the absurd consequences canon to read "hearing officer" as including district court judges. We reject this interpretive approach, however, because it risks allowing future courts to inject policy concerns into an analysis that should and has traditionally focused on the terms of the statute.

¶45 As to the second point, however, I dissent from the majority's conclusion that the UPWA allows an employer to unilaterally withhold wages without first obtaining authorization to do so from an administrative law judge, a hearing officer, or a district court judge. The majority's reading is inconsistent with the text and structure of the statute and frustrates the central purpose of the UPWA, which is to ensure that employees receive prompt

C.J. DURRANT, concurring in part and dissenting

payment of earned wages. The majority effectively gives an employer a lien in the form of withheld earned wages to secure any counterclaims it has against the employee. In my view, this is not what the legislature intended. Accordingly, I respectfully dissent. I would affirm the district court's decision and hold that the plain meaning and structure of the statute require a preliminary proffer of evidence warranting an offset *before* an employer withholds earned wages, not after.

## I. Applying the Plain and Technical Meaning of "Hearing Officer" Leads to Absurd Results

¶46 Our caselaw recognizes two different interpretive tools concerning absurdity. We have referred to the first as the absurd consequences canon[15] and to the second as the absurdity doctrine.[16] We apply the absurd consequences canon to resolve ambiguities in a statute.[17] If statutory language lends itself to two alternative readings, we choose the reading that avoids absurd consequences.[18] The absurdity doctrine, by contrast, has nothing to do with resolving ambiguities. Rather, we apply this canon to reform unambiguous statutory language where applying the plain lan-

---

[15] *See State v. Redd*, 1999 UT 108, ¶ 12, 992 P.2d 986 ("Where we are faced with two alternative readings, and we have no reliable sources that clearly fix the legislative purpose, . . . . we interpret [the] statute to avoid absurd consequences.")

[16] *See Cox v. Laycock*, 2015 UT 20, ¶¶ 71–73, 345 P.3d 689 (Lee, J., concurring) (noting that under "the doctrine of absurdity," we depart from the plain language of a statute if interpreting the text as written leads to a result "so overwhelmingly absurd that no rational legislator could ever be deemed to have supported a literal application of its text").

[17] *See Encon Utah, LLC v. Fluor Ames Kraemer, LLC*, 2009 UT 7, ¶ 73, 210 P.3d 263 ("When statutory language plausibly presents the court with two alternative readings, we prefer the reading that avoids absurd results." (internal quotation marks omitted)).

[18] *Id.*

guage leads to results so overwhelmingly absurd no rational legislator could have intended them.[19]

¶47 It is important that we carefully distinguish between the absurd consequences canon and the absurdity doctrine because the invocation of the latter is a far more momentous step than is the invocation of the former, and therefore requires a more compelling justification. In applying the absurd consequences canon, we merely resolve an ambiguity by choosing "the reading that avoids absurd results" when "statutory language plausibly presents [us] with two alternative readings."[20] By contrast, when we apply the absurdity doctrine, rather than simply preferring one plausible reading over another, we interpret the statute "contrary" to its plain meaning.[21]

¶48 This is a drastic step, one we have described as "strong medicine, not to be administered lightly."[22] Accordingly, we apply the absurdity doctrine with more caution than we do the absurd consequences canon.[23] This is because when a statute is ambiguous, we are uncertain which reading of the statute the legislature intended, so we presume they intended the reading that leads to the more practical outcome. But when a statute is unambiguous, the statutory language is almost always irrefutable evidence of the legislature's intent, even if it leads to results we regard as impractical or ill-advised. So to override the plain language under the absurdity doctrine, the operation of the plain language must be more than improvident, it must be so over-

---

[19] *See State ex rel. Z.C.*, 2007 UT 54, ¶¶ 11–13, 165 P.3d 1206; *see also Cox*, 2015 UT 20, ¶ 71 (Lee, J., concurring).

[20] *Encon Utah, LLC*, 2009 UT 7, ¶ 73, (internal quotation marks omitted); *see also Cox*, 2015 UT 20, ¶ 71 (Lee, J., concurring).

[21] *State ex rel. Z.C.*, 2007 UT 54, ¶ 15 n.5.

[22] *Cox*, 2015 UT 20, ¶ 71 (Lee, J., concurring).

[23] *State ex rel. Z.C.*, 2007 UT 54, ¶ 15 n.5 (noting that the absurd consequences doctrine "does not necessitate the same level of caution" as the absurdity doctrine).

C.J. DURRANT, concurring in part and dissenting

whelmingly absurd that no rational legislator could have intended the statute to operate in such a manner.[24]

¶49   It is therefore critical that we be exacting in our ambiguity analysis. Because deeming a word to be ambiguous opens the door to application of the absurd consequences canon, with the less compelling showing it requires, doing so too liberally risks allowing future courts to inject policy views into statutes where their meaning should be controlled by their plain terms. Here, the term "hearing officer" as used in the UPWA is, under our traditional rules of statutory construction, so clearly unambiguous that to deem it otherwise creates such a risk.

¶50  In the case before us, both the absurd consequences canon and the absurdity doctrine are satisfied, so our disagreement with the lead opinion on whether "hearing officer" is ambiguous is of no consequence. But in other cases the question of whether a statute is ambiguous, and therefore whether the absurd consequences canon or the absurdity doctrine applies, may be determinative. So it is critical that we carefully distinguish between the two doctrines. For this reason, although we reach the same result as the lead opinion on this question, we deem the term "hearing officer" to unambiguously not include district court judges, but under the absurdity doctrine, we nevertheless reform the statute to include them.

*A. The Legislature Did Not Intend "Hearing Officer" to*
*Mean District Court Judge*

¶51  To withhold earned wages under subsection 5(c), an employer must "present[] evidence" to "a hearing officer or an administrative law judge" that "would warrant an offset."[25] In concluding that the term "hearing officer" is ambiguous, the lead

---

[24] *See id.* ¶ 12; *see also Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶¶ 69–70, 267 P.3d 863 (Lee, J., dissenting) (discussing the differences between the absurd consequences canon and the absurdity doctrine).

[25] UTAH CODE § 34-28-3(5)(c). The UPWA was amended effective May 2014, but we refer throughout our opinion to the 2013 version of the statute, which is identical to the version in effect at the time of Mill Man's withholding.

opinion begins by noting that we "regularly refer to judges as 'judicial officers'" and that "a typical responsibility of such an officer is to preside over hearings."[26] While conceding that district court judge "is not the most common use of the term 'hearing officer'" and that the term has taken on specialized meaning in the context of administrative law, the lead opinion nevertheless concludes that "the legislature must have employed" this "broader sense" of the term to "encompass[] district court judges,"[27] because holding otherwise would effectively "render subsection 5(c) void for claims of $10,000 or more."[28]

¶52 As we have discussed, the absurd consequences canon is intended to operate as a tie-breaker when a statute's plain text lends itself to two plausible alternative readings.[29] That is not the case here, because the term "hearing officer" in the UPWA does not lend itself to two plausible interpretations. When interpreting a statute, our primary goal is to ascertain the intent of the legislature.[30] And in performing that task, we first consult the "ordinary, and commonly understood meaning"[31] of the statute's terms, often referring to dictionary definitions.[32] But when the legislature "borrows terms of art"[33] that have accumulated a specialized, technical meaning, we "explain them by reference to the art or sci-

---

[26] *Supra* ¶ 38.

[27] *Supra* ¶¶ 39, 42.

[28] *Supra* ¶ 40.

[29] *See, e.g.*, *State v. Redd*, 1999 UT 108, ¶¶ 12–14 (interpreting a criminal statute that could be "read in two ways" to avoid consequences the court regarded as "absurd").

[30] *Marion Energy, Inc.*, 2011 UT 50, ¶ 14.

[31] *Wasatch County v. Okelberry*, 2008 UT 10, ¶ 13, 179 P.3d 768 (internal quotation marks omitted).

[32] *Hi-Country Prop. Rights Grp. v. Emmer*, 2013 UT 33, ¶¶ 18–19, 304 P.3d 851.

[33] *Maxfield v. Herbert*, 2012 UT 44, ¶ 31, 284 P.3d 647 (internal quotation marks omitted).

ence to which they [are] appropriate."[34] Normally, when these sources show "the language of a statute is clear and unambiguous, our analysis ends; our duty is to give effect to that plain meaning."[35] Here, however, the lead opinion determines that the term "hearing officer" is ambiguous even though its proffered alternative reading finds no support in either the ordinary meaning of the term or the specialized meaning it has acquired in the context of administrative law.

¶53   With respect to ordinary meaning, dictionary definitions of "hearing officer" do not include "district court judge."[36] Black's Law Dictionary offers two definitions for the term "hearing officer." The one listed first is "administrative-law judge."[37] The second is "[a] person, usu[ally] an attorney, who serves in an appointive capacity at the pleasure of an appointing judge, and whose actions and decisions are reviewed by that judge."[38] Because a district court judge is not an "administrative-law judge" and does not "serve[] in an appointive capacity at the pleasure of

---

[34] *Corning Glass Works v. Brennan*, 417 U.S. 188, 201 (1974) (alteration in original) (internal quotation marks omitted); *see also Hi-Country Prop. Rights Grp.*, 2013 UT 33, ¶ 18 ("Because that term is not expressly defined in the Act, and does not appear to be a technical term of art, we construe it to partake of the ordinary meaning the word would have to a reasonable person familiar with the usage and context of the language in question." (internal quotation marks omitted)).

[35] *State ex rel. Z.C.*, 2007 UT 54, ¶ 11.

[36] *See State v. Canton*, 2013 UT 44, ¶ 13, 308 P.3d 517 ("In determining the ordinary meaning of nontechnical terms of a statute, our starting point is the dictionary." (internal quotation marks omitted)).

[37] BLACK'S LAW DICTIONARY 790 (9th ed. 2009).

[38] *Id.* (referring to the third definition of "judicial officer" as another definition for hearing officer); *id.* at 1193 (defining "judicial officer" as "[a] person, usu. an attorney, who serves in an appointive capacity at the pleasure of an appointing judge, and whose actions and decisions are reviewed by that judge").

22

an appointing judge," a district court judge does not fall within the dictionary definition of "hearing officer."[39]

¶54 The term "hearing officer" has also acquired specialized meaning in the context of administrative law, and that technical definition does not encompass district court judges either. When the legislature employs technical terms that have accumulated specialized meaning in a particular field, we presume it "knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken."[40] The term "hearing officer" has a well-accepted meaning in the administrative-law context and is consistently used by the legislature to mean an officer within an agency. For example, the Utah health code,[41] the state system of public education code,[42] the insurance code,[43] and the municipal code[44] all provide instances where the applicable agency or governing board appoints or selects a "hearing officer" to take evidence, make preliminary findings, or hear grievances. In each of these cases, there is no argument that "hearing officer" was intended to be used interchange-

---

[39] Webster's Third New International Dictionary provides a similar definition, referring to an individual in appointed or reviewable capacity that is empowered to investigate, commence claims, make findings, and make recommendations to the agency. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1044 (1961).

[40] *Maxfield*, 2012 UT 44, ¶ 31 (internal quotation marks omitted).

[41] UTAH CODE § 26-8a-407(3) (providing that a "hearing officer" shall preside over formal adjudicative proceedings involving ground ambulance and paramedic licenses).

[42] *Id.* § 53A-6-602(1) (providing that a "hearing officer" may be appointed to conduct a hearing and make recommendations concerning findings).

[43] *Id.* § 31A-2-301(1) (providing that the Commissioner of Insurance may appoint a "hearing officer" to assist in proceedings before the Commissioner).

[44] *Id.* § 10-3-1106(2)(a) (providing that municipal employees may appeal a final decision to discharge to a "hearing officer").

ably with "district court judge." And we are unaware of any statutes that employ the term "hearing officer" to mean district court judge.

¶55  Instead of grounding its interpretation of "hearing officer" in either the plain meaning or specialized use of that term, the lead opinion cites a number of cases dealing with probation revocation proceedings and concludes that it is "not unheard of . . . to use the terminology of 'hearing officer'" to encompass "district judges."[45] And the lead opinion argues that in a number of prior cases, we "have used" the term hearing officer "in a manner implicitly encompassing district judges."[46] Reliance on these cases is misplaced for two reasons: (1) they tell us little about what the legislature intended when it drafted the UPWA, and (2) the lead opinion over reads the scope of our holdings in those cases.

¶56  In *State v. Orr*,[47] we applied U.S. Supreme Court precedent to the question of whether a district court can properly extend a defendant's probation if the defendant "did not receive notice that the State intended to extend [the defendant's] probation until after his probation was set to expire."[48] In holding that a district court could extend probation under such circumstances, we applied *Gagnon v. Scarpelli*,[49] which provides that one of the "minimum requirements" of due process to which a probationer is entitled is "'the right to confront and cross-examine adverse witnesses (unless the *hearing officer* specifically finds good cause for not allowing confrontation).'"[50] The lead opinion focuses on our use of the term "hearing officer" and concludes that we implicitly character-

---

[45] *See supra* ¶ 38.

[46] *Supra* ¶ 37 n.11.

[47] 2005 UT 92, 127 P.3d 1213.

[48] *Id.* ¶ 10.

[49] 411 U.S. 778 (1973).

[50] *Orr*, 2005 UT 92, ¶ 20 (emphasis added) (quoting *Gagnon*, 411 U.S. at 786).

ized district court judges as hearing officers in *Orr* and four other decisions addressing the same issue.[51]

¶57 First, even accepting the lead opinion's reading of these cases, the central focus of our inquiry in the case at hand is not what *this court* has meant in using the term "hearing officer" in the context of criminal procedure. It is what *the legislature* intended when it used that term in the UPWA.[52] And we cannot accept that the legislature looked past the dictionary definition of the term and its well-accepted technical meaning in order to codify a more obscure understanding of "hearing officer" that, as we explain below, we at best tacitly acknowledged in the context of probation revocation proceedings.

¶58 Second, the lead opinion over reads these cases. It argues that we "used the terminology of 'hearing officer' in a manner implicitly encompassing district judges,"[53] but a closer reading of each case forecloses even that conclusion. Some states, like Utah and Missouri, hold revocation proceedings primarily in district court.[54] But others, like Wisconsin and Iowa, hold probation revocation proceedings before an agency.[55] The Supreme Court in *Gagnon* used the term "hearing officer" because that case involved an appeal from an administrative probation revocation proceeding in Wisconsin,[56] and it quoted language from *Morrisey v. Brew-*

---

[51] *Supra* ¶¶ 37–38 & n.11; *see Morishita v. Morris*, 621 P.2d 691, 694 (Utah 1980) (Wilkins, J., dissenting); *State v. Tate*, 1999 UT App 302, ¶¶ 10–12, 989 P.2d 73; *Layton City v. Peronek*, 803 P.2d 1294, 1299 (Utah Ct. App. 1990); *State v. Hodges*, 798 P.2d 270, 273 (Utah Ct. App. 1990).

[52] *See Marion Energy, Inc.*, 2011 UT 50, ¶ 14.

[53] *See supra* ¶ 38 n.12.

[54] *See Morishita*, 621 P.2d at 692–93; *see also* MO. REV. STAT. § 559.036 (2015).

[55] *See State ex rel. Vanderbeke v. Endicott*, 563 N.W.2d 883, 889 (Wis. 1997); *see also* IOWA CODE § 908.4(1) (2015) ("The parole revocation hearing shall be conducted by an administrative parole judge who is an attorney.").

[56] *See Gagnon*, 411 U.S. at 779, 786.

*er*, an administrative probation revocation case from Iowa.[57] But when deciding whether a probationer from Missouri had been afforded due process in his revocation hearing before a state court, the Supreme Court used the word "judge."[58] And tellingly, the only use of the term "hearing officer" in any of the Utah cases the lead opinion cites appears in direct quotes from *Gagnon*; we refer to judges as "trial court," "court," "district court," and "district judge" elsewhere in those decisions.

¶59 By quoting the U.S. Supreme Court's precedent characterizing administrative officials from Iowa and Wisconsin who preside over probation revocation proceedings as "hearing officers," we may have tacitly acknowledged that some states employ judges and other states employ agency officials to perform the same task in this narrow context. But we did not analyze the plain meaning of "hearing officer" in any of those cases, nor did we decide what that term meant in the context of administrative law. So this line of cases has little to say about how we should interpret the legislature's use of that term in the UPWA.

¶60 In sum, neither the ordinary nor the technical meaning of the term "hearing officer" plausibly includes district court judges. Rather, all the relevant sources—dictionary definitions, specialized use, and definitions of that term in other administrative law statutes—indicate that the term means a person appointed by an administrative law judge to conduct investigations, process claims, hold hearings, and assess penalties. Therefore, the lead opinion errs in relying upon the absurd consequences canon because the term "hearing officer" unambiguously does not include district court judge. So although, as we explain below, we agree that this reading of the statute leads to absurd results, we decline to adopt the lead opinion's reasoning, because we believe doing so risks allowing future courts to inject policy considerations into

---

[57] *Id.* at 786 (quoting *Morrissey*, 408 U.S. at 489).

[58] *See Black v. Romano*, 471 U.S. 606, 615–16 (1985) (explaining that the "decision to revoke" a Missouri defendant's "probation satisfied the requirements of due process" because "he had a full opportunity to present mitigating factors to the sentencing judge and to propose alternatives to incarceration").

an analysis that should be focused exclusively on the terms of the statute.

## B. Failing to Read "Hearing Officer" to Include "District Court Judge" Leads to Absurd Results

¶61  Although we disagree with the lead opinion's interpretive approach, we understand, and indeed we share, its motivation. As the lead opinion points out, an employee can bring a withholding claim under $10,000 before the Commission or a district court, and claims exceeding that threshold may only be brought in district court. But there is no clear procedural mechanism outlined in the statute or the Commission's regulations directing employers as to how they may secure "the opinion" of a "hearing officer" to sanction a withholding. The result is patently absurd: a district court can hear any wage claim, but only the Commission can approve a withholding, even though the Commission lacks jurisdiction to even *hear* wage claims that exceed $10,000. In effect, then, the statute gives employers an opportunity to withhold as to small counterclaims but denies them that same opportunity for claims employers are most likely to pursue—large counterclaims that exceed the $10,000 threshold.

¶62  We can think of no reason why withholding claims should be treated this way, and the parties have not offered one. But rather than attempt to justify a conclusion that "district court judge" is a permissible construction of "hearing officer," we conclude that this was an oversight on the part of the legislature. No reasonable legislator could have intended this inequitable, overwhelmingly absurd result. "Normally, where the language of a statute is clear and unambiguous, our analysis ends; our duty is to give effect to that plain meaning."[59] But under the absurdity doctrine, "a court should not follow the literal language of a statute if its plain meaning works an absurd result."[60] As we have noted, we do not often employ this canon, with its required compelling showing, because doing so runs the risk of substituting "our views of good policy for that of the legislature."[61] For this canon

---

[59] *State ex rel. Z.C.*, 2007 UT 54, ¶ 11.

[60] *Id.* (internal quotation marks omitted).

[61] *Cox*, 2015 UT 20, ¶ 71 (Lee, J., concurring).

C.J. DURRANT, concurring in part and dissenting

to apply, then, the plain language must lead to a result so overwhelmingly absurd that no reasonable legislator could have intended it.[62]

¶63 That standard is met in this case. The plain, unambiguous, operation of the statutory language treats employers differently based on the size of an employee's wage claim and the forum in which the employee chooses to pursue it. And neither the statute, the regulations, the trial court's ruling, nor Mr. Utley advances any justification for such an inequity. Because we cannot believe any rational legislator could have intended to treat withholding claims in this manner, we reform the statute under the absurdity doctrine to read "hearing officer, administrative law judge, or district court judge" and thereby permit district court judges the same authority as hearing officers to approve a withholding made under subsection 5(c). We therefore reach the same result as the lead opinion, but base that result on a rationale we consider more consistent with our traditional principles of statutory construction.

II. The UPWA Does Not Allow for Preemptive Withholdings

¶64 Even though I ultimately agree with a majority of the Court that district court judges should be able to approve a withholding under subsection 5(c), I cannot agree with the majority's conclusion allowing employers to preemptively withhold earned wages so long as they convince a court to sanction the withholding after the fact. This is not a dispute about whether Mr. Utley earned the wages at issue. Mill Man concedes that he earned the commissions he claims. Rather, it is a dispute over who will hold these wages during the pendency of Mill Man's counterclaim. May Mill Man hold them as a lien securing a potential judgment on its counterclaim, or may Mr. Utley hold them subject to ultimately disgorging them if Mill Man prevails on its counterclaim? The majority permits Mill Man to retain Mr. Utley's wages despite the fact that the statute presumes that wages earned by an employee will be promptly paid unless an employer satisfies its burden of demonstrating the application of an exception.

---

[62] *State ex rel. Z.C.*, 2007 UT 54, ¶ 13.

¶65 In permitting the employer to preemptively withhold wages without making any showing whatsoever, the majority turns the essential purpose of the statute on its head. Rather than shifting the financial risk of wage withholding to employers by requiring them to establish an exception before withholding, the majority's reading of the statute allows the employer to withhold wages that have admittedly been earned pending the resolution of the employer's counterclaim.

¶66 I believe reading the statute in this manner is inconsistent with its plain terms, our interpretive canons, and the central concern animating the UPWA. And it also confers powerful settlement leverage on the employer. In my view, this is not what the legislature intended. Because Mill Man failed to present evidence before an administrative law judge, a hearing officer, or a district court judge prior to withholding Mr. Utley's wages, I would affirm the district court's summary judgment in Mr. Utley's favor.

¶67 To begin, the plain language and structure of the statute strongly suggest subsection 5(c) does not permit preemptive withholdings. Under that subsection, an employer cannot withhold wages "*unless* . . . the employer presents evidence that in the opinion of a hearing officer or administrative law judge would warrant an offset."[63] By using the term "unless," the statute conditions the employer's ability to withhold on the presentation of evidence.[64] "The word 'unless' is a subordinating conjunction in common usage, connecting a dependent or subordinate clause of a sentence with the main or primary clause."[65] Here, the subordinate clause, or condition, is the employer's presentation of evidence, and "[u]nless the condition [is] met, there can be no [with-

---

[63] UTAH CODE § 34-28-3(5)(c) (emphasis added).

[64] *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2503 (1961) (defining "unless" as "except on the condition that,"); AMERICAN HERITAGE DICTIONARY 1402 (1980) (same).

[65] *Kansas City Structural Steel Co. v. L. G. Barcus & Sons, Inc.*, 535 P.2d 419, 423 (Kan. 1975).

C.J. DURRANT, concurring in part and dissenting

holding]."[66] In my view, this term requires an employer to present evidence *before* it withholds wages, not after.

¶68  I recognize that the term "unless" does not denote a temporal restriction as clearly as other terms, such as "until"[67] or "before."[68]  Unlike the term "hearing officer," it is genuinely ambiguous. That said, any ambiguity in the statute is resolved by applying basic principles of statutory construction. When interpreting a statute, we do not read the ordinary meaning of its terms in isolation; rather, we "determine the meaning of the text given the relevant context of the statute," including "the structure and language of the statutory scheme."[69] We also look to the terms surrounding an ambiguous provision to see if they share "a common feature from which we may extrapolate meaning."[70]

¶69  These principles of statutory construction clarify any ambiguity in the term "unless." As used in subsection 5(c), it means "before." Moreover, the context and structure of the statute also foreclose the majority's reading allowing preemptive withholdings. The statute's central purpose is to require employers to

---

[66] *See Graham v. Wichita Terminal Elevator Co.*, 222 P. 89, 90 (Kan. 1924) (interpreting the term "unless" in a similar context under the Kansas Workmen's Compensation Act).

[67] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2513 (1961) (noting that "until" is "used as a function word after a negative expression to indicate performance or occurrence at a specified time"); AMERICAN HERITAGE DICTIONARY 1405 (1980) (defining "until" as "[u]p to the time of" and "[b]efore a specified time").

[68] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 197 (1961) (defining "before" as "preceding (a point, turn, or incident in time)," as well as "preceding (something or someone in a chronological series)); AMERICAN HERITAGE DICTIONARY 119 (1980) (defining "before" as "in front; ahead; in advance" and "prior to").

[69] *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 12, 248 P.3d 465.

[70] *Thayer v. Washington Cnty. Sch. Dist.*, 2012 UT 31, ¶ 15, 285 P.3d 1142.

promptly pay wages unless they can justify nonpayment.[71] It establishes a general rule requiring prompt payment of earned wages in regular intervals and within twenty-four hours of termination.[72] The statute also provides a remedy to employees who haven't been paid,[73] and it imposes civil and criminal penalties on employers who fail to comply.[74] If an employer wishes to withhold wages that have been earned, it has the burden of establishing an exception to the statute's general presumption that employees should be promptly paid.

¶70 There are four exceptions to the statutory presumption of prompt payment that allow an employer to withhold admittedly earned wages, and three of them unambiguously permit a withholding only if the employer receives some form of authorization *before* the withholding takes place. For example, an employer may withhold wages (1) under an express agreement from the employee; (2) under federal or state legal requirements, or a court order;[75] or (3) "as a contribution of the employee" to an established 401k

---

[71] *See, e.g.*, UTAH CODE § 34-28-3(6) ("An employer may not require an employee to rebate, refund, offset, or return a part of the wage, salary, or compensation to be paid to the employee except as provided in Subsection (5)."); *id.* § 34-28-5(1)(a) (providing that wages for a terminated employee "become due immediately" and must be paid "within 24 hours"); *id.* § 34-28-5(1)(b)(i) ("In case of failure to pay wages due an employee within 24 hours of written demand, the wages of the employee shall continue from the date of demand until paid, but in no event to exceed 60 days, at the same rate that the employee received at the time of separation."); *id.* § 34-28-9(2), (3) (imposing monetary penalties on employer's who wrongfully withhold wages); *id.* § 34-28-12(1) ("Any employer who shall violate, or fail to comply with any of the provisions of this chapter shall be guilty of a misdemeanor.").

[72] *See id.* §§ 34-28-3, -5.

[73] *See id.* §§ 34-28-5(1)(b), 34-28-9(1).

[74] *See id.* §§ 34-28-5, 34-28-9(2)–(3), 34-28-12.

[75] *Id.* § 34-28-3(5)(a), (b).

plan.[76] The remaining exception is of course the one at issue here—it allows a withholding if "the employer presents evidence that in the opinion of a hearing officer or an administrative law judge would warrant an offset."[77]

¶71  Under the canon of noscitur a soccis (it is known for its associates),[78] if several terms in a list share a common attribute, we interpret other terms in the list in accordance with that common feature.[79] Because the withholding exceptions listed before and after subsection 5(c) all "share[] the same attribute" of being set or agreed to before a withholding takes place, the structure of subsection 5 is strong evidence of a legislative intent that an employer must also present evidence before withholding earned wages under subsection 5(c).

¶72  This reading is also supported by the canon of consistent usage, which provides that "where a word has a clear and definite meaning when used in one part of . . . a document, but not when used in another, the presumption is that the word is intended to

---

[76] Section 34-28-3(5)(d)(i) allows an employer to withhold wages "as a contribution of the employee under a contract or plan that is: described in Section 401(k) [of the United States Code]." But before receiving 401(k) contributions from employees, an employer must ensure that it establishes a "qualified" 401(k) plan. *See* MERTENS LAW OF FEDERAL INCOME TAXATION § 25B:10 (2014). For a plan to be deemed "qualified," the employer must satisfy a series of requirements, including having "a definite, permanent (as distinguished from temporary) plan," "a written document," and a "plan established and maintained by an employer." *Id.* Accordingly, an employer could not withhold an employee's wages for the purpose of contributing to a 401(k) plan unless the employer had previously established a "qualified" 401(k) plan.

[77] UTAH CODE § 34-28-3(5)(c).

[78] *Turner v. Staker & Parson Cos.*, 2012 UT 30, ¶ 10 n.5, 284 P.3d 600.

[79] *See Thayer*, 2012 UT 31, ¶ 15.

have the same meaning in the latter as in the former."[80] We recently relied on this canon to interpret the term "management" in the Utah Governmental Immunity Act.[81] In *Barneck v. Utah Department of Transportation*, we were asked to determine whether the phrase "management of flood waters" in the Act was limited to "the physical function of actively control[ling] and direct[ing] the flood waters themselves" or also encompassed the decision to leave flood waters undisturbed.[82] We held that the broader definition applied, relying on the canon of consistent usage.[83] We observed that the term management appeared in a series—"the management of flood waters, earthquakes, or natural disasters"—and the "*only way* that government can *manage* those phenomena is in the broad sense" of deciding how best to respond to them; after all, "[o]ne cannot *control* or *direct* an earthquake or a tornado."[84] And "under the canon of consistent usage," we concluded, "management cannot properly mean one thing as applied to two of the objects in a series (earthquakes and natural disasters) but something else as applied to the other object in the same series (flood waters)."[85]

¶73 The majority's reading of subsection 5(c) is inconsistent with this canon. This is made clear when subsection 5 is viewed in its entirety:

> (5) An employer may not withhold or divert part of
>      an employee's wages *unless*:
>          (a) the employer is required to withhold or
>              divert the wages by:
>                  (i) court order; or

---

[80] ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 170 (2012) (internal quotation marks omitted).

[81] *Barneck v. UDOT*, 2015 UT 50, ¶ 30.

[82] *Id.* ¶ 31 (alterations in original) (internal quotation marks omitted).

[83] *Id.* ¶ 31.

[84] *Id.* (emphasis omitted) (internal quotation marks omitted).

[85] *Id.* (internal quotation marks omitted).

C.J. DURRANT, concurring in part and dissenting

> > (ii) state or federal law;
> (b) the employee expressly authorizes the deduction in writing;
> (c) the employer presents evidence that in the opinion of a hearing officer or an administrative law judge would warrant an offset; or
> (d) subject to Subsection (7), the employer withholds or diverts the wages [for contributions toward qualified retirement plans][86]

The majority acknowledges that the term "unless" is "*sometimes temporal*"[87] and that "the other subsection 5 exceptions appear to be formulated in terms that may be satisfied *before* an employer's withholding."[88] But the word "unless" is used *just once* in subsection 5. It is not even repeated before each exception. To me, this is the canon of consistent usage squared. It would be odd indeed for the legislature to intend a single word to have a different meaning as applied to subsection (c) than it has as applied to subsections (a), (b), and (d). Yet by allowing employers to preemptively withhold wages and *then* "present evidence" warranting an offset, that is precisely what the majority does. Its reading is therefore inconsistent with our application of the canon of consistent usage in *Barneck*; the same word cannot be a temporal limitation for some elements in a list but merely conditional for others.[89]

---

[86] UTAH CODE § 34-28-3(5) (emphasis added).

[87] *Supra* ¶ 13.

[88] *Supra* ¶ 28 (emphasis added).

[89] The majority interprets the term "'unless' . . . as merely expressing a condition (without any suggestion as to *timing*)," based on "the legal and practical context of the statute's operation." *Supra* ¶ 14. And it dismisses the fact that "some of the listed objects" in subsection 5 "will usually be satisfied before the withholding" as irrelevant to this conclusion. *Supra* ¶ 14 n.4. This artificial narrowing of the meaning of the term "unless" is unwarranted. Here the practical context of the statute cuts in the opposite direction to the one argued by the majority. *See supra* ¶ 12. As I have dis-

(continued . . .)

¶74 In summary, the Act's central purpose is to assure that employees receive prompt payment of earned wages, and three of the specific withholding exceptions clearly must be satisfied *before* wages are withheld. These features of the statute, in my view, clarify any ambiguity resulting from the legislature's use of the term "unless" in subsection 5(c). If an employer wants to withhold earned wages under that exception, it must first present evidence to a hearing officer, an administrative law judge, or a district court judge. Here, Mill Man withheld the entirety of Mr. Utley's commissions before presenting any evidence of its offsetting claims. And it admits that "assuming that there were no other issues or defenses between Mill Man and [Mr.] Utley, [Mr.] Utley would have been entitled to payment of additional commissions in the sum of [$]100,479.99." Having failed to present evidence to an administrative law judge, a hearing officer, or a district court judge that would warrant an offset before making its withholding, Mill Man's withholding was, in my view, improper.

¶75 The majority acknowledges that it is plausible to interpret the statute in this way, but it rejects my reading based on a concern that such an interpretation renders subsection 5(c) a dead letter. It reasons that because the UPWA requires an employer to pay wages within twenty-four hours of an employee's termination, requiring employers to present evidence supporting a withholding *before* retaining the employee's wages is a practical impossibility.[90] An employer would be "hard-pressed," it concludes, to secure even the "entry of a stay or a temporary restraining order" within such a "narrow timeframe."[91] The majority's reading of the statute is deficient in a number of respects.

¶76 First, it leads to the absurd result of requiring an employer to risk criminal liability in order to pursue a good-faith counterclaim. Section 34-28-12 provides that "[a]ny employer who shall violate, or fail to comply with any of the provisions of this chapter

---

cussed, timing is a significant component of the other three subsection 5 withholding exceptions, and the central focus of the UPWA is on timing—when and under what conditions wages must be paid.

[90] *Supra* ¶¶ 13–15.

[91] *Supra* ¶ 16.

C.J. DURRANT, concurring in part and dissenting

shall be guilty of a misdemeanor."[92] This language makes no exception for good-faith counterclaims that the employer is later unable to prove in court. So under the majority's reading, any employer who withholds wages based on a good-faith counterclaim against the employee is guilty of a crime the moment a court rules in the employee's favor. This would be true even in a close case where the employee satisfies the preponderance of the evidence standard only by the narrowest of margins.[93]

¶77 Certainly the legislature did not intend a statutory regime where an employer is, as a matter of practical impossibility, precluded from withholding wages without risking criminal liability. I know of no example in our caselaw or statutes where losing a civil claim, including those brought in good faith, can result in criminal liability. In my mind, to read the statute in this way presents an absurdity every bit as great as the one that the majority and I agree mandates the inclusion of district court judge in subsection 5(c).[94]

---

[92] UTAH CODE § 34-28-12(1).

[93] The majority concedes that under its reading of the statute, "the potential for criminal liability arises whenever an employer is found to have violated the statute," even when claims are brought in good faith and the employer loses by the narrowest of margins. *Supra* ¶ 24. To any employers who are understandably leery of pursuing legitimate counterclaims under the specter of potential criminal charges, the majority offers cold comfort—"the buffer" of "prosecutorial discretion." *Supra* ¶ 25. We have no way of knowing whether a prosecutor "would presumably be inclined to withhold criminal charges" when an employer loses a good-faith counterclaim. *See supra* ¶ 25. And in my view, an employer's ability to pursue legitimate withholding claims against an employee should not depend on the good graces of whoever happens to reside in the district attorney's office when the claim arises. I believe the far better answer to the conundrum presented by the statute's imposition of criminal liability for the failure of even good-faith counterclaims is that the legislature intended the employer to make its proffer before withholding.

[94] *See supra* ¶¶ 37–42, 61–63.

C.J. DURRANT, concurring in part and dissenting

¶78 Second, there is a more straight-forward way to read subsection 5(c) so that it remains a viable exception while avoiding this absurd result. I acknowledge that the twenty-four-hour period is problematic if we read the statute to require a full-fledged decision on the merits after an evidentiary hearing.[95] But the question under subsection 5(c) is not the underlying merits of the employer's counterclaim. Rather, it is which party retains admittedly earned wages during the adjudication of such a claim.

¶79 In my view, this is why the language in subsection 5(c) is phrased conditionally. The employer's burden to justify a withholding is not to prevail on the merits. It is to "present[] evidence that . . . *would* warrant an offset."[96] I believe the conditional language, coupled with the short timeframe in which an employer must satisfy its burden, indicates a legislative intent to require only a threshold showing or proffer of evidence that, if proven, warrants an offset—not a full-blown evidentiary hearing and a judgment on the underlying merits.

¶80 As a practical matter, employers will likely have all or most of this evidence on hand when an employee is terminated. After all, the employer controls the timing the termination. And before making the decision to terminate an employee, an employer has presumably accumulated and analyzed the evidence it believes justifies this decision. Further, our district court judges are regularly available to hear urgent matters on short notice. For these reasons, while it may be difficult for employers to make their proffer of evidence within the twenty-four-hour window, it is not the near impossible task suggested by the majority. And it would certainly not be inconsistent with the terms of the UPWA to then allow the administrative law judge, hearing officer, or district court judge a reasonable time in which to make a preliminary finding on whether the proffered evidence, if proven, would warrant an offset.[97]

---

[95] *See supra* ¶¶ 14–16.

[96] UTAH CODE § 34-28-3(5)(c) (emphasis added).

[97] The majority argues that requiring a preliminary proffer of evidence justifying the withholding is not compatible with the procedural mechanisms prescribed in our rules of civil procedure,

(continued . . .)

C.J. DURRANT, concurring in part and dissenting

¶81 Moreover, in any case where an employer cannot timely make its proffer of evidence in the ordinary course, other mechanisms are available to it. For example, an employer could seek a temporary restraining order or a preliminary injunction under rule 65A of the Utah Rules of Civil Procedure.[98] Ex parte motions for emergency relief are also routinely decided within a day, but even if the proceedings take more time, the employer could couple the motion for emergency relief with a motion to stay any monetary or criminal penalties pending consideration of the evidence.[99]

---

*supra* ¶ 17, and it maintains that reading the statute in this way would "develop[] a new procedural mechanism" that "alter[s] our civil rules" without the two-thirds majority vote in both houses of the legislature that our constitution requires. *Supra* ¶ 17.

Reading the statute to require a preliminary showing does not create a novel procedural mechanism or a new procedural rule. In subsection 5(c), the legislature sets forth a substantive rule controlling when an employer may withhold wages and, by using conditional language suggestive of a proffer ("presents evidence that in the opinion of a hearing officer . . . *would* warrant an offset"), indicates an evidentiary standard. *See* UTAH CODE § 34-28-3(5)(c) (emphasis added). There is nothing new or novel about a hearing to determine whether an evidentiary standard has been met.

[98] UTAH R. CIV. P. 65A(e)(4).

[99] These procedural mechanisms are not "imagin[ed]" "heroic," or "practically unavailable." *See supra* ¶¶ 17, 20, 22. The majority's argument dismissing them hinges, in large part, on its insistence that the subsection 5(c) evidentiary threshold requires "a merits-based 'opinion' on the legal viability of an offset." *Supra* ¶ 21. I agree that such a ruling "could hardly be entered on an ex parte basis," *supra* ¶ 21, but in other contexts, courts routinely accord temporary relief during ex parte proceedings. *See, e.g.*, UTAH CODE § 78B-7-106(1) (authorizing courts to enter ex parte protective orders to protect a petitioner from domestic abuse); *id.* § 78B-7-202 (providing the same relief for victims of child abuse); *id.* § 38-9a-202 (authorizing courts to issue ex parte civil wrongful lien injunctions); *id.* § 77-3a-101 (allowing courts to issue ex parte civil

(continued . . .)

¶82 For these reasons, I do not believe the twenty-four-hour-payment requirement mandates the majority's reading of subsection 5(c). And I am convinced that its interpretation of that subsection, which allows preemptive withholdings and precludes an employer from asserting even a good-faith counterclaim without risking criminal liability, is inconsistent with the central purpose of the UWPA—to ensure the prompt payment of earned wages.[100] And to me it is more than a little ironic that the majority uses the twenty-four-hour-payment requirement, a provision that highlights the urgency the legislature placed on the prompt payment of wages, as justification for allowing the employer to withhold earned wages during the full pendency of its counterclaim.

¶83 In sum, authorizing an employer to make unilateral, preemptive withholding decisions inverts the central purpose of the statute. Instead of shifting the financial risk of a wage dispute

---

stalking injunctions). And in any event, I have identified these procedural mechanisms as fall backs an employer might use if they are unable to make a preliminary showing within twenty-four hours. As I have explained, I see no reason why we cannot read subsection 5(c) as providing an employer a mechanism to obtain a preliminary remedy that allows it to retain wages subject to disgorging them later if its underlying counterclaim fails.

[100] The majority rejects this argument because it finds "no basis for concluding that this was the legislature's *only* purpose, or that it sought to vindicate this 'central purpose' at the expense of all other concerns." *Supra* ¶ 33. And it maintains that another purpose recognized in the statute's text is to protect "the employer's interest in withholding wages under the exceptions set forth in [sub]section 5." *Supra* ¶ 34. I agree with the majority that statutory language is often "the result of a legislative give-and-take that balances multiple concerns," *supra* ¶ 34 (internal quotation marks omitted), and that subsection 5 recognizes employers' interests in withholding wages. But that does not tell us much about whether subsection 5(c) allows preemptive withholdings. After all, requiring employers to seek approval before they withhold wages accommodates both of these interests; employees receive prompt payment of earned wages, and employers can pursue legitimate counterclaims without facing criminal liability.

C.J. DURRANT, concurring in part and dissenting

to employers, the majority's reading effectively gives employers a lien on any unpaid, but earned, wages to secure a counterclaim. This gives employers powerful settlement leverage in a relationship where they already enjoy unequal bargaining power. Perpetuating this imbalance frustrates the basic purpose of the statute, and I do not believe the legislature intended such a consequence.

¶84 For these reasons, I respectfully dissent. Although I agree with the majority that district court judges should be able to approve a withholding under subsection 5(c), I would hold that the district court properly granted summary judgment because Mill Man did not present evidence *before* withholding Mr. Utley's wages.

————————